ROBERT B. HOWELL, APPELLEE, V. BEE PUBLISHING COMPANY
ET AL., APPELLANTS.

FILED JUNE 3, 1916. No. 18882.

Injunction: PUBLICATIONS. The publication of political matter in a
newspaper cannot be enjoined merely because it is false or mis-
leading, such relief being forbidden by the following constitutional
provisions: "Every person may freely speak, write and publish
on all subjects, being responsible for the abuse of that liberty;
and in all trials for libel, both civil and criminal, the truth when
published with good motives, and for justifiable ends, shall be a
sufficient defense." Const., art. I, sec. 5.

APPEAL from the district court for Douglas county:
WILLIS G. SEARS, JUDGE. Reversed and dismissed.

Rosewater & Cotner and W. J. Connell, for appellants.

Brome & Brome, contra.

ROSE, J.

This is a suit in equity to enjoin the publication of an
article relating to the candidacy of plaintiff for the office of
governor of Nebraska. At the primary election August
18, 1914, plaintiff aspired to be the republican nominee,
but before becoming a candidate he had made and pub-
lished the following statement:

"I have felt very much complimented by the suggestion
of my name for governor, and as much as I should like
to serve this state in that honorable capacity, yet I am
more strongly inclined to carry on the work of public
ownership in this city. As a result I will not be a can-
didate at the coming primary, but will devote my energies
to the water plant and to a campaign for lower electric
rates through the development of a public lighting and
power plant under the control of the Metropolitan Water
District.

"Omaha, June 16, 1914.        R. B. HOWELL."

Afterward plaintiff departed from the purpose thus announced and became an active candidate. August 17, 1914, the day before the primary election, the statement quoted, including the date, "June 16, 1914," was reproduced in the Omaha Evening Bee, under the following head-lines:

"HOWELL WILL NOT RUN.
"HIS ANNOUNCEMENT EXPLAINING WHY HIS
"FRIENDS SHOULD NOT CAST THEIR
"VOTES FOR HIM."

Defendants are the publisher and the editor of the Omaha Evening Bee, a daily newspaper. On plaintiff's petition they were restrained by the district court August 17, 1914, as follows:

"It is hereby ordered that the defendants, and each, be and they hereby are restrained and enjoined from printing, publishing, circulating, delivering or mailing any newspaper or other publication to the voters of Nebraska, or to any person or persons within said state, or copy or edition of said newspaper containing any notice or statement of any kind or nature whatsoever, the publication of which states or declares that the plaintiff is not a candidate for the republican nomination for governor of the state of Nebraska, at the primary election to be held August 18, 1914, until the further order of the court."

On appeal defendants take the position that the censorship thus exercised by the trial court is forbidden by the following provisions of the state Constitution:

"Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth when published with good motives, and for justifiable ends, shall be a sufficient defense." Const., art. I, sec. 5.

Was the restraining order properly granted? The answer depends on the meaning of the Constitution. The freedom of the press was not a liberty enumerated in the Magna Charta, but was a subsequent growth of several

centuries.   After the printing press became a means of disseminating information and opinions relating to the church and the state, all printed matter was subjected to censorship or supervision.   This power was first exercised by the church and afterward by the crown.   A printer was required to obtain a license.   For publishing seditious opinions such punishment as mutilation, whipping, imprisonment, banishment and death was inflicted.   The practice of supervising manuscripts in advance of publication was finally abandoned, but the press was subsequently restricted by vigorous prosecutions for libel and by cruel interpretations of the law on that subject.   The doctrine that the truth was no justification for its publication originated in the Star Chamber.   Trials for seditious libels became a reproach to the Anglo-Saxon civilization.   The use of governmental power in England to limit the activity of the press extended to the American Colonies.   In replying to an inquiry by English commissioners concerning the condition of Virginia in 1670, Governor Berkeley said:

"I thank God there are no free schools, nor printing; and I hope we shall not have, these hundred years; for learning has brought disobedience, and heresy, and sects into the world, and printing has divulged them, and libels against the best government.   God keep us from both."

The use of the printing press in Virginia was prohibited or restricted until Revolutionary times.   In New England official licensers exercised a censorship over the press in the seventeenth century, and in Massachusetts printing was hampered by legal restraints until a few years before the Declaration of Independence.   The evils calling for a different attitude toward printing were fresh in the public mind when the first American Constitutions were framed.   The first amendment of the Constitution of the United States contains the provision that congress shall make no law abridging the freedom of the press.   The powerful agency of the press in the evolution of just

and efficient government and the indefensible restrictions imposed upon publishers were understood generally when provisions similar to those quoted from the Nebraska Constitution were inserted in the fundamental law of many of the states. In the light of history, some of the leading purposes disclosed by the language of the Constitution cannot be misunderstood. The power to exercise a censorship over political publications, as formerly practiced, is taken away. The exercise of censorship by a court of equity through the writ of injunction is no less objectionable than the exercise of that function by other departments of the government. The truth when published with good motives and for justifiable ends, contrary to the doctrine of the Star Chamber, is a defense in an action for libel, either civil or criminal. It follows that a court cannot use its equity powers to prevent the publication of political matter merely on the ground that it is untruthful or misleading, its truthfulness and its publication for good motives and for justifiable ends being a defense in an action at law.

The power of a court of equity to protect from improper publications the administration of justice and property, contract, personal or other rights guaranteed by either the state or federal Constitution, is not presented or decided.

The restraining order should not have been granted.

REVERSED AND DISMISSED.

HAMER, J., not sitting.

SEDGWICK, J., concurring.

The majority of the court declare in the syllabus: "The publication of political matter in a newspaper cannot be enjoined merely because it is false or misleading," because the Constitution provides: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty; and in all trials for libel, both civil and criminal, the truth when published

with good motives, and for justifiable ends, shall be a
sufficient defense." The opinion does not define what is
"political matter," and does not say why the fact that
it is a defense in an action for libel to prove that the
publication was for good motives and for justifiable ends
should prevent a court of equity from interfering. I do
not recall any more important proposition than the one
that is so decided in this opinion. No provision of our
Constitution has been more litigated and discussed by the
courts than the provision that "every person may freely
speak, write and publish on all subjects, being respon-
sible for the abuse of that liberty." The discussion started
in the courts before our Constitution was adopted, and,
in fact, long before the federal Constitution was adopted,
it was much discussed in the courts of England. I suppose
that it is the intention of the opinion in this case to hold
that publication in a newspaper will not be enjoined
under any circumstances because every person may
freely speak, write and publish on all subjects. Several
hundred years ago this was announced as the law in
England, but the English courts have entirely aban-
doned the doctrine, and at the present time the courts
of England deal with injury to personality by writing
and publishing in the same manner that they deal with
any other torts. There has been a most remarkable growth
in this country in the same direction. In *Francis v.
Flinn,* 118 U. S. 385, the supreme court of the United
States announced the dictum that "in the eyes of the
law" damages are an adequate remedy for all publications;
but a very few years later in the famous case of *Gompers
v. Buck Stove & Range Co.,* 221 U. S. 418, that court
sustained an injunction restraining the defendants "from
printing, issuing, publishing, or distributing" certain mat-
ters which were alleged to be injurious to the plaintiffs.
This shows a remarkable growth in the direction of requir-
ing courts of equity to restrain wrongdoing when there
is no other remedy to prevent it, and this does not seem
to me to be a violation of the Constitution. Those who

publish are "responsible for the abuse of that liberty," and it is the abuse of the liberty that is enjoined, and not the liberty itself.

There are other reasons given in the brief for reversing the judgment in this case which seem to call for reversal. I am not satisfied with the discussion in the majority opinion, nor with the statement of the law in the syllabus.