NEAR *v.* MINNESOTA ex rel. OLSON, COUNTY ATTORNEY.

No. 91.   Argued January 30, 1931.—Decided June 1, 1931.

698

*Mr. Weymouth Kirkland,* with whom *Messrs. Thomas E. Latimer, Howard Ellis,* and *Edward C. Caldwell* were on the brief, for appellant.

*Messrs. James E. Markham,* Assistant Attorney General of Minnesota, and *Arthur L. Markve,* Assistant County Attorney of Hennepin County, with whom *Messrs. Henry N. Benson,* Attorney General, *John F. Bonner,* Assistant Attorney General, *Ed. J. Goff,* County Attorney, and *William C. Larson,* Assistant County Attorney, were on the brief, for appellee.

700

Mr. Chief Justice Hughes delivered the opinion of the Court.

Chapter 285 of the Session Laws of Minnesota for the year 1925 [1] provides for the abatement, as a public nuisance, of a "malicious, scandalous and defamatory news-

[1] Mason's Minnesota Statutes, 1927, 10123-1 to 10123-3.

paper, magazine or other periodical." Section one of the Act is as follows:

"Section 1. Any person who, as an individual, or as a member or employee of a firm, or association or organization, or as an officer, director, member or employee of a corporation, shall be engaged in the business of regularly or customarily producing, publishing or circulating, having in possession, selling or giving away.

(a) an obscene, lewd and lascivious newspaper, magazine, or other periodical, or

(b) a malicious, scandalous and defamatory newspaper, magazine or other periodical,

is guilty of a nuisance, and all persons guilty of such nuisance may be enjoined, as hereinafter provided.

"Participation in such business shall constitute a commission of such nuisance and render the participant liable and subject to the proceedings, orders and judgments provided for in this Act. Ownership, in whole or in part, directly or indirectly, of any such periodical, or of any stock or interest in any corporation or organization which owns the same in whole or in part, or which publishes the same, shall constitute such participation.

"In actions brought under (b) above, there shall be available the defense that the truth was published with good motives and for justifiable ends and in such actions the plaintiff shall not have the right to report (sic) to issues or editions of periodicals taking place more than three months before the commencement of the action."

Section two provides that whenever any such nuisance is committed or exists, the County Attorney of any county where any such periodical is published or circulated, or, in case of his failure or refusal to proceed upon written request in good faith of a reputable citizen, the Attorney General, or upon like failure or refusal of the latter, any citizen of the county, may maintain an action in the district court of the county in the name of the State to enjoin

perpetually the persons committing or maintaining any such nuisance from further committing or maintaining it. Upon such evidence as the court shall deem sufficient, a temporary injunction may be granted. The defendants have the right to plead by demurrer or answer, and the plaintiff may demur or reply as in other cases.

The action, by section three, is to be " governed by the practice and procedure applicable to civil actions for injunctions," and after trial the court may enter judgment permanently enjoining the defendants found guilty of violating the Act from continuing the violation and, " in and by such judgment, such nuisance may be wholly abated." The court is empowered, as in other cases of contempt, to punish disobedience to a temporary or permanent injunction by fine of not more than $1,000 or by imprisonment in the county jail for not more than twelve months.

Under this statute, clause (b), the County Attorney of Hennepin County brought this action to enjoin the publication of what was described as a " malicious, scandalous and defamatory newspaper, magazine and periodical," known as " The Saturday Press," published by the defendants in the city of Minneapolis. The complaint alleged that the defendants, on September 24, 1927, and on eight subsequent dates in October and November, 1927, published and circulated editions of that periodical which were " largely devoted to malicious, scandalous and defamatory articles " concerning Charles G. Davis, Frank W. Brunskill, the Minneapolis Tribune, the Minneapolis Journal, Melvin C. Passolt, George E. Leach, the Jewish Race, the members of the Grand Jury of Hennepin County impaneled in November, 1927, and then holding office, and other persons, as more fully appeared in exhibits annexed to the complaint, consisting of copies of the articles described and constituting 327 pages of the record. While the complaint did not so allege, it

appears from the briefs of both parties that Charles G. Davis was a special law enforcement officer employed by a civic organization, that George E. Leach was Mayor of Minneapolis, that Frank W. Brunskill was its Chief of Police, and that Floyd B. Olson (the relator in this action) was County Attorney.

Without attempting to summarize the contents of the voluminous exhibits attached to the complaint, we deem it sufficient to say that the articles charged in substance that a Jewish gangster was in control of gambling, bootlegging and racketeering in Minneapolis, and that law enforcing officers and agencies were not energetically performing their duties. Most of the charges were directed against the Chief of Police; he was charged with gross neglect of duty, illicit relations with gangsters, and with participation in graft. The County Attorney was charged with knowing the existing conditions and with failure to take adequate measures to remedy them. The Mayor was accused of inefficiency and dereliction. One member of the grand jury was stated to be in sympathy with the gangsters. A special grand jury and a special prosecutor were demanded to deal with the situation in general, and, in particular, to investigate an attempt to assassinate one Guilford, one of the original defendants, who, it appears from the articles, was shot by gangsters after the first issue of the periodical had been published. There is no question but that the articles made serious accusations against the public officers named and others in connection with the prevalence of crimes and the failure to expose and punish them.

At the beginning of the action, on November 22, 1927, and upon the verified complaint, an order was made directing the defendants to show cause why a temporary injunction should not issue and meanwhile forbidding the defendants to publish, circulate or have in their possession any editions of the periodical from September

24, 1927, to November 19, 1927, inclusive, and from publishing, circulating, or having in their possession, "any future editions of said The Saturday Press" and "any publication, known by any other name whatsoever containing malicious, scandalous and defamatory matter of the kind alleged in plaintiff's complaint herein or otherwise."

The defendants demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action, and on this demurrer challenged the constitutionality of the statute. The District Court overruled the demurrer and certified the question of constitutionality to the Supreme Court of the State. The Supreme Court sustained the statute (174 Minn. 457; 219 N. W. 770), and it is conceded by the appellee that the Act was thus held to be valid over the objection that it violated not only the state constitution but also the Fourteenth Amendment of the Constitution of the United States.

Thereupon, the defendant Near, the present appellant, answered the complaint. He averred that he was the sole owner and proprietor of the publication in question. He admitted the publication of the articles in the issues described in the complaint but denied that they were malicious, scandalous or defamatory as alleged. He expressly invoked the protection of the due process clause of the Fourteenth Amendment. The case then came on for trial. The plaintiff offered in evidence the verified complaint, together with the issues of the publication in question, which were attached to the complaint as exhibits. The defendant objected to the introduction of the evidence, invoking the constitutional provisions to which his answer referred. The objection was overruled, no further evidence was presented, and the plaintiff rested. The defendant then rested, without offering evidence. The plaintiff moved that the court direct the issue of a permanent injunction, and this was done.

The District Court made findings of fact, which followed the allegations of the complaint and found in general terms that the editions in question were " chiefly devoted to malicious, scandalous and defamatory articles," concerning the individuals named. The court further found that the defendants through these publications " did engage in the business of regularly and customarily producing, publishing and circulating a malicious, scandalous and defamatory newspaper," and that " the said publication " " under said name of The Saturday Press, or any other name, constitutes a public nuisance under the laws of the State."  Judgment was thereupon entered adjudging that " the newspaper, magazine and periodical known as The Saturday Press," as a public nuisance, " be and is hereby abated."  The judgment perpetually enjoined the defendants " from producing, editing, publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous or defamatory newspaper, as defined by law," and also " from further conducting said nuisance under the name and title of said The Saturday Press or any other name or title."

The defendant Near appealed from this judgment to the Supreme Court of the State, again asserting his right under the Federal Constitution, and the judgment was affirmed upon the authority of the former decision.   179 Minn. 40; 228 N. W. 326.  With respect to the contention that the judgment went too far, and prevented the defendants from publishing any kind of a newspaper, the court observed that the assignments of error did not go to the form of the judgment and that the lower court had not been asked to modify it.   The court added that it saw no reason " for defendants to construe the judgment as restraining them from operating a newspaper in harmony with the public welfare, to which all must yield," that the allegations of the complaint had been

found to be true, and, though this was an equitable action, defendants had not indicated a desire " to conduct their business in the usual and legitimate manner."

From the judgment as thus affirmed, the defendant Near appeals to this Court.

This statute, for the suppression as a public nuisance of a newspaper or periodical, is unusual, if not unique, and raises questions of grave importance transcending the local interests involved in the particular action. It is no longer open to doubt that the liberty of the press, and of speech, is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action. It was found impossible to conclude that this essential personal liberty of the citizen was left unprotected by the general guaranty of fundamental rights of person and property. *Gitlow* v. *New York,* 268 U. S. 652, 666; *Whitney* v. *California,* 274 U. S. 357, 362, 373; *Fiske* v. *Kansas,* 274 U. S. 380, 382; *Stromberg* v. *California, ante,* p. 359. In maintaining this guaranty, the authority of the State to enact laws to promote the health, safety, morals and general welfare of its people is necessarily admitted. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise. Thus, while recognizing the broad discretion of the legislature in fixing rates to be charged by those undertaking a public service, this Court has decided that the owner cannot constitutionally be deprived of his right to a fair return, because that is deemed to be of the essence of ownership. *Railroad Commission Cases,* 116 U. S. 307, 331; *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. 585, 596. So, while liberty of contract is not an absolute right, and the wide field of activity in the making of contracts is subject to legislative supervision (*Frisbie* v. *United States,* 157 U. S. 161, 165), this Court has held that the power of the State stops short of interference with what are deemed

to be certain indispensable requirements of the liberty assured, notably with respect to the fixing of prices and wages. *Tyson Bros.* v. *Banton,* 273 U. S. 418; *Ribnik* v. *McBride,* 277 U. S. 350; *Adkins* v. *Children's Hospital,* 261 U. S. 525, 560, 561. Liberty of speech, and of the press, is also not an absolute right, and the State may punish its abuse. *Whitney* v. *California, supra; Stromberg* v. *California, supra.* Liberty, in each of its phases, has its history and connotation and, in the present instance, the inquiry is as to the historic conception of the liberty of the press and whether the statute under review violates the essential attributes of that liberty.

The appellee insists that the questions of the application of the statute to appellant's periodical, and of the construction of the judgment of the trial court, are not presented for review; that appellant's sole attack was upon the constitutionality of the statute, however it might be applied. The appellee contends that no question either of motive in the publication, or whether the decree goes beyond the direction of the statute, is before us. The appellant replies that, in his view, the plain terms of the statute were not departed from in this case and that, even if they were, the statute is nevertheless unconstitutional under any reasonable construction of its terms. The appellant states that he has not argued that the temporary and permanent injunctions were broader than were warranted by the statute; he insists that what was done was properly done if the statute is valid, and that the action taken under the statute is a fair indication of its scope.

With respect to these contentions it is enough to say that in passing upon constitutional questions the court has regard to substance and not to mere matters of form, and that, in accordance with familiar principles, the statute must be tested by its operation and effect. *Henderson* v. *Mayor,* 92 U. S. 259, 268; *Bailey* v. *Alabama,* 219

U. S. 219, 244; *United States* v. *Reynolds,* 235 U. S. 133, 148, 149; *St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350, 362; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 237. That operation and effect we think is clearly shown by the record in this case. We are not concerned with mere errors of the trial court, if there be such, in going beyond the direction of the statute as construed by the Supreme Court of the State. It is thus important to note precisely the purpose and effect of the statute as the state court has construed it.

*First.* The statute is not aimed at the redress of individual or private wrongs. Remedies for libel remain available and unaffected. The statute, said the state court, "is not directed at threatened libel but at an existing business which, generally speaking, involves more than libel." It is aimed at the distribution of scandalous matter as "detrimental to public morals and to the general welfare," tending "to disturb the peace of the community" and "to provoke assaults and the commission of crime." In order to obtain an injunction to suppress the future publication of the newspaper or periodical, it is not necessary to prove the falsity of the charges that have been made in the publication condemned. In the present action there was no allegation that the matter published was not true. It is alleged, and the statute requires the allegation, that the publication was "malicious." But, as in prosecutions for libel, there is no requirement of proof by the State of malice in fact as distinguished from malice inferred from the mere publication of the defamatory matter.[2] The judgment in this case proceeded upon the mere proof of publication. The statute permits the defense, not of the truth alone, but only that the truth was published with good motives and

---

[2] Mason's Minn. Stats. 10112, 10113; *State* v. *Shipman,* 83 Minn. 441, 445; 86 N. W. 431; *State* v. *Minor,* 163 Minn. 109, 110; 203 N. W. 596.

for justifiable ends. It is apparent that under the statute the publication is to be regarded as defamatory if it injures reputation, and that it is scandalous if it circulates charges of reprehensible conduct, whether criminal or otherwise, and the publication is thus deemed to invite public reprobation and to constitute a public scandal. The court sharply defined the purpose of the statute, bringing out the precise point, in these words: " There is no constitutional right to publish a fact merely because it is true. It is a matter of common knowledge that prosecutions under the criminal libel statutes do not result in efficient repression or suppression of the evils of scandal. Men who are the victims of such assaults seldom resort to the courts. This is especially true if their sins are exposed and the only question relates to whether it was done with good motives and for justifiable ends. This law is not for the protection of the person attacked nor to punish the wrongdoer. It is for the protection of the public welfare."

*Second.* The statute is directed not simply at the circulation of scandalous and defamatory statements with regard to private citizens, but at the continued publication by newspapers and periodicals of charges against public officers of corruption, malfeasance in office, or serious neglect of duty. Such charges by their very nature create a public scandal. They are scandalous and defamatory within the meaning of the statute, which has its normal operation in relation to publications dealing prominently and chiefly with the alleged derelictions of public officers.[3]

---

[3] It may also be observed that in a prosecution for libel the applicable Minnesota statute (Mason's Minn. Stats., 1927, §§ 10112, 10113), provides that the publication is justified "whenever the matter charged as libelous is true and was published with good motives and for justifiable ends," and also "is excused when honestly made, in

*Third.* The object of the statute is not punishment, in the ordinary sense, but suppression of the offending newspaper or periodical. The reason for the enactment, as the state court has said, is that prosecutions to enforce penal statutes for libel do not result in " efficient repression or suppression of the evils of scandal." Describing the business of publication as a public nuisance, does not obscure the substance of the proceeding which the statute authorizes. It is the continued publication of scandalous and defamatory matter that constitutes the business and the declared nuisance. In the case of public officers, it is the reiteration of charges of official misconduct, and the fact that the newspaper or periodical is principally devoted to that purpose, that exposes it to suppression. In the present instance, the proof was that nine editions of the newspaper or periodical in question were published on successive dates, and that they were chiefly devoted to charges against public officers and in relation to the prevalence and protection of crime. In such a case, these officers are not left to their ordinary remedy in a suit for libel, or the authorities to a prosecution for criminal libel. Under this statute, a publisher of a newspaper or periodical, undertaking to conduct a campaign to expose and to censure official derelictions, and devoting his publication principally to that purpose, must face not simply the possibility of a verdict against him in a suit or prosecution for libel, but a determination that his newspaper or periodical is a public nuisance to be abated, and that this abatement and suppression will follow unless he is prepared with legal evidence to prove the truth of the charges and also to satisfy the court that, in

belief of its truth, and upon reasonable grounds for such belief, and consists of fair comments upon the conduct of a person in respect to public affairs." The clause last mentioned is not found in the statute in question.

addition to being true, the matter was published with good motives and for justifiable ends.

This suppression is accomplished by enjoining publication and that restraint is the object and effect of the statute.

*Fourth.* The statute not only operates to suppress the offending newspaper or periodical but to put the publisher under an effective censorship. When a newspaper or periodical is found to be "malicious, scandalous and defamatory," and is suppressed as such, resumption of publication is punishable as a contempt of court by fine or imprisonment. Thus, where a newspaper or periodical has been suppressed because of the circulation of charges against public officers of official misconduct, it would seem to be clear that the renewal of the publication of such charges would constitute a contempt and that the judgment would lay a permanent restraint upon the publisher, to escape which he must satisfy the court as to the character of a new publication. Whether he would be permitted again to publish matter deemed to be derogatory to the same or other public officers would depend upon the court's ruling. In the present instance the judgment restrained the defendants from "publishing, circulating, having in their possession, selling or giving away any publication whatsoever which is a malicious, scandalous or defamatory newspaper, as defined by law." The law gives no definition except that covered by the words "scandalous and defamatory," and publications charging official misconduct are of that class. While the court, answering the objection that the judgment was too broad, saw no reason for construing it as restraining the defendants "from operating a newspaper in harmony with the public welfare to which all must yield," and said that the defendants had not indicated "any desire to conduct their business in the usual and legitimate manner," the manifest inference is that, at least with respect to a

new publication directed against official misconduct, the defendant would be held, under penalty of punishment for contempt as provided in the statute, to a manner of publication which the court considered to be " usual and legitimate " and consistent with the public welfare.

If we cut through mere details of procedure, the operation and effect of the statute in substance is that public authorities may bring the owner or publisher of a newspaper or periodical before a judge upon a charge of conducting a business of publishing scandalous and defamatory matter—in particular that the matter consists of charges against public officers of official dereliction—and unless the owner or publisher is able and disposed to bring competent evidence to satisfy the judge that the charges are true and are published with good motives and for justifiable ends, his newspaper or periodical is suppressed and further publication is made punishable as a contempt.  This is of the essence of censorship.

The question is whether a statute authorizing such proceedings in restraint of publication is consistent with the conception of the liberty of the press as historically conceived and guaranteed.  In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. The struggle in England, directed against the legislative power of the licenser, resulted in renunciation of the censorship of the press.[4]  The liberty deemed to be established was thus described by Blackstone: " The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published.  Every freeman has an

---

[4] May, Constitutional History of England, vol. 2, chap. IX, p. 4; DeLolme, Commentaries on the Constitution of England, chap. IX, pp. 318, 319

undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequence of his own temerity." 4 Bl. Com. 151, 152; see Story on the Constitution, §§ 1884, 1889. The distinction was early pointed out between the extent of the freedom with respect to censorship under our constitutional system and that enjoyed in England. Here, as Madison said, " the great and essential rights of the people are secured against legislative as well as against executive ambition. They are secured, not by laws paramount to prerogative, but by constitutions paramount to laws. This security of the freedom of the press requires that it should be exempt not only from previous restraint by the Executive, as in Great Britain, but from legislative restraint also." Report on the Virginia Resolutions, Madison's Works, vol. IV, p. 543. This Court said, in *Patterson* v. *Colorado,* 205 U. S. 454, 462: " In the first place, the main purpose of such constitutional provisions is ' to prevent all such *previous restraints* upon publications as had been practiced by other governments,' and they do not prevent the subsequent punishment of such as may be deemed contrary to the public welfare. *Commonwealth* v. *Blanding,* 3 Pick. 304, 313, 314; *Respublica* v. *Oswald,* 1 Dallas, 319, 325. The preliminary freedom extends as well to the false as to the true; the subsequent punishment may extend as well to the true as to the false. This was the law of criminal libel apart from statute in most cases, if not in all. *Commonwealth* v. *Blanding, ubi sup.;* 4 Bl. Com. 150."

The criticism upon Blackstone's statement has not been because immunity from previous restraint upon publication has not been regarded as deserving of special emphasis, but chiefly because that immunity cannot be deemed to exhaust the conception of the liberty guaranteed by

state and federal constitutions. The point of criticism has been " that the mere exemption from previous restraints cannot be all that is secured by the constitutional provisions "; and that " the liberty of the press might be rendered a mockery and a delusion, and the phrase itself a by-word, if, while every man was at liberty to publish what he pleased, the public authorities might nevertheless punish him for harmless publications." 2 Cooley, Const. Lim., 8th ed., p. 885. But it is recognized that punishment for the abuse of the liberty accorded to the press is essential to the protection of the public, and that the common law rules that subject the libeler to responsibility for the public offense, as well as for the private injury, are not abolished by the protection extended in our constitutions. *id*. pp. 883, 884. The law of criminal libel rests upon that secure foundation. There is also the conceded authority of courts to punish for contempt when publications directly tend to prevent the proper discharge of judicial functions. *Patterson* v. *Colorado*, supra; *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402, 419.[5] In the present case, we have no occasion to inquire as to the permissible scope of subsequent punishment. For whatever wrong the appellant has committed or may commit, by his publications, the State appropriately affords both public and private redress by its libel laws. As has been noted, the statute in question does not deal with punishments; it provides for no punishment, except in case of contempt for violation of the court's order, but for suppression and injunction, that is, for restraint upon publication.

The objection has also been made that the principle as to immunity from previous restraint is stated too

---

[5] See *Huggonson's Case*, 2 Atk. 469; *Respublica* v. *Oswald*, 1 Dallas 319; *Cooper* v. *People*, 13 Colo. 337, 373; 22 Pac. 790; *Nebraska* v. *Rosewater*, 60 Nebr. 438; 83 N. W. 353; *State* v. *Tugwell*, 19 Wash. 238; 52 Pac. 1056; *People* v. *Wilson*, 64 Ill. 195; *Storey* v. *People*, 79 Ill. 45; *State* v. *Circuit Court*, 97 Wis. 1; 72 N. W. 193.

broadly, if every such restraint is deemed to be prohibited. That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases: "When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right." *Schenck* v. *United States,* 249 U. S. 47, 52. No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops.[6] On similar grounds, the primary requirements of decency may be enforced against obscene publications. The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government. The constitutional guaranty of free speech does not "protect a man from an injunction against uttering words that may have all the effect of force. *Gompers* v. *Buck Stove & Range Co.,* 221 U. S. 418, 439." *Schenck* v. *United States, supra.* These limitations are not applicable here. Nor are we now concerned with questions as to the extent of authority to prevent publications in order to protect private rights according to the principles governing the exercise of the jurisdiction of courts of equity.[7]

The exceptional nature of its limitations places in a strong light the general conception that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship. The conception of the liberty of the press in this country had broadened with the exigencies of the colonial

---

[6] Chafee, Freedom of Speech, p. 10.

[7] See 29 Harvard Law Review, 640.

period and with the efforts to secure freedom from oppressive administration.[8] That liberty was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officers and charges of official misconduct. As was said by Chief Justice Parker, in *Commonwealth* v. *Blanding*, 3 Pick. 304, 313, with respect to the constitution of Massachusetts: " Besides, it is well understood, and received as a commentary on this provision for the liberty of the press, that it was intended to prevent all such *previous restraints* upon publications as had been practiced by other governments, and in early times here, to stifle the efforts of patriots towards enlightening their fellow subjects upon their rights and the duties of rulers. The liberty of the press was to be unrestrained, but he who used it was to be responsible in case of its abuse." In the letter sent by the Continental Congress (October 26, 1774) to the Inhabitants of Quebec, referring to the " five great rights " it was said: [9] " The last right we shall mention, regards the freedom of the press. The importance of this consists, besides the advancement of truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government, its ready communication of thoughts between subjects, and its consequential promotion of union among them, whereby oppressive officers are shamed or intimidated, into more honourable and just modes of conducting affairs." Madison, who was the leading spirit in the preparation of the First Amendment of the Federal Constitution, thus described the practice and sentiment which led to the guaranties of liberty of the press in state constitutions: [10]

[8] See Duniway " The Development of Freedom of the Press in Massachusetts," p. 123; Bancroft's History of the United States, vol. 2, 261.

[9] Journal of the Continental Congress, 1904 ed., vol. I, pp. 104, 108.

[10] Report on the Virginia Resolutions, Madison's Works, vol. iv, 544.

" In every State, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men of every description which has not been confined to the strict limits of the common law. On this footing the freedom of the press has stood; on this footing it yet stands. . . . Some degree of abuse is inseparable from the proper use of everything, and in no instance is this more true than in that of the press. It has accordingly been decided by the practice of the States, that it is better to leave a few of its noxious branches to their luxuriant growth, than, by pruning them away, to injure the vigour of those yielding the proper fruits. And can the wisdom of this policy be doubted by any who reflect that to the press alone, chequered as it is with abuses, the world is indebted for all the triumphs which have been gained by reason and humanity over error and oppression; who reflect that to the same beneficent source the United States owe much of the lights which conducted them to the ranks of a free and independent nation, and which have improved their political system into a shape so auspicious to their happiness? Had ' Sedition Acts,' forbidding every publication that might bring the constituted agents into contempt or disrepute, or that might excite the hatred of the people against the authors of unjust or pernicious measures, been uniformly enforced against the press, might not the United States have been languishing at this day under the infirmities of a sickly Confederation? Might they not, possibly, be miserable colonies, groaning under a foreign yoke? "

The fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deep-seated conviction that such restraints would violate constitutional right. Public officers, whose character and

conduct remain open to debate and free discussion in the press, find their remedies for false accusations in actions under libel laws providing for redress and punishment, and not in proceedings to restrain the publication of newspapers and periodicals. The general principle that the constitutional guaranty of the liberty of the press gives immunity from previous restraints has been approved in many decisions under the provisions of state constitutions.[11]

The importance of this immunity has not lessened. While reckless assaults upon public men, and efforts to bring obloquy upon those who are endeavoring faithfully to discharge official duties, exert a baleful influence and deserve the severest condemnation in public opinion, it cannot be said that this abuse is greater, and it is believed to be less, than that which characterized the period in which our institutions took shape. Meanwhile, the administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and

---

[11] *Dailey* v. *Superior Court*, 112 Cal. 94, 98; 44 Pac. 458; *Jones, Varnum & Co.* v. *Townsend's Admx.*, 21 Fla. 431, 450; *State ex rel. Liversey* v. *Judge*, 34 La. 741, 743; *Commonwealth* v. *Blanding*, 3 Pick. 304, 313; *Lindsay* v. *Montana Federation of Labor*, 37 Mont. 264, 275, 277; 96 Pac. 127; *Howell* v. *Bee Publishing Co.*, 100 Neb. 39, 42; 158 N. W. 358; *New Yorker Staats-Zeitung* v. *Nolan*, 89 N. J. Eq. 387; 105 Atl. 72; *Brandreth* v. *Lane*, 8 Paige 24; *New York Juvenile Guardian Society* v. *Roosevelt*, 7 Daly 188; *Ulster Square Dealer* v. *Fowler*, 111 N. Y. Supp. 16; *Star Co.* v. *Brush*, 170 *id.* 987; 172 *id.* 320; 172 *id.* 851; *Dopp* v. *Doll*, 9 Ohio Dec. Rep. 428; *Respublica* v. *Oswald*, 1 Dall. 319, 325; *Respublica* v. *Dennie*, 4 Yeates 267, 269; *Ex parte Neill*, 32 Tex. Cr. 275; 22 S. W. 923; *Mitchell* v. *Grand Lodge*, 56 Tex. Civ. App. 306, 309; 121 S. W. 178; *Sweeney* v. *Baker*, 13 W. Va. 158, 182; *Citizens Light, Heat & Power Co.* v. *Montgomery Light & Water Co.*, 171 Fed. 553, 556; *Willis* v. *O'Connell*, 231 Fed. 1004, 1010; *Dearborn Publishing Co.* v. *Fitzgerald*, 271 Fed. 479, 485.

property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct. Subsequent punishment for such abuses as may exist is the appropriate remedy, consistent with constitutional privilege.

In attempted justification of the statute, it is said that it deals not with publication *per se*, but with the "business" of publishing defamation. If, however, the publisher has a constitutional right to publish, without previous restraint, an edition of his newspaper charging official derelictions, it cannot be denied that he may publish subsequent editions for the same purpose. He does not lose his right by exercising it. If his right exists, it may be exercised in publishing nine editions, as in this case, as well as in one edition. If previous restraint is permissible, it may be imposed at once; indeed, the wrong may be as serious in one publication as in several. Characterizing the publication as a business, and the business as a nuisance, does not permit an invasion of the constitutional immunity against restraint. Similarly, it does not matter that the newspaper or periodical is found to be "largely" or "chiefly" devoted to the publication of such derelictions. If the publisher has a right, without previous restraint, to publish them, his right cannot be deemed to be dependent upon his publishing something else, more or less, with the matter to which objection is made.

Nor can it be said that the constitutional freedom from previous restraint is lost because charges are made of derelictions which constitute crimes. With the multiplying provisions of penal codes, and of municipal charters and ordinances carrying penal sanctions, the conduct of

public officers is very largely within the purview of criminal statutes. The freedom of the press from previous restraint has never been regarded as limited to such animadversions as lay outside the range of penal enactments. Historically, there is no such limitation; it is inconsistent with the reason which underlies the privilege, as the privilege so limited would be of slight value for the purposes for which it came to be established.

The statute in question cannot be justified by reason of the fact that the publisher is permitted to show, before injunction issues, that the matter published is true and is published with good motives and for justifiable ends. If such a statute, authorizing suppression and injunction on such a basis, is constitutionally valid, it would be equally permissible for the legislature to provide that at any time the publisher of any newspaper could be brought before a court, or even an administrative officer (as the constitutional protection may not be regarded as resting on mere procedural details) and required to produce proof of the truth of his publication, or of what he intended to publish, and of his motives, or stand enjoined. If this can be done, the legislature may provide machinery for determining in the complete exercise of its discretion what are justifiable ends and restrain publication accordingly. And it would be but a step to a complete system of censorship. The recognition of authority to impose previous restraint upon publication in order to protect the community against the circulation of charges of misconduct, and especially of official misconduct, necessarily would carry with it the admission of the authority of the censor against which the constitutional barrier was erected. The preliminary freedom, by virtue of the very reason for its existence, does not depend, as this Court has said, on proof of truth. *Patterson* v. *Colorado, supra.*

Equally unavailing is the insistence that the statute is designed to prevent the circulation of scandal which tends

to disturb the public peace and to provoke assaults and the commission of crime. Charges of reprehensible conduct, and in particular of official malfeasance, unquestionably create a public scandal, but the theory of the constitutional guaranty is that even a more serious public evil would be caused by authority to prevent publication. " To prohibit the intent to excite those unfavorable sentiments against those who administer the Government, is equivalent to a prohibition of the actual excitement of them; and to prohibit the actual excitement of them is equivalent to a prohibition of discussions having that tendency and effect; which, again, is equivalent to a protection of those who administer the Government, if they should at any time deserve the contempt or hatred of the people, against being exposed to it by free animadversions on their characters and conduct." [12] There is nothing new in the fact that charges of reprehensible conduct may create resentment and the disposition to resort to violent means of redress, but this well-understood tendency did not alter the determination to protect the press against censorship and restraint upon publication. As was said in *New Yorker Staats-Zeitung* v. *Nolan*, 89 N. J. Eq. 387, 388; 105 Atl. 72: " If the township may prevent the circulation of a newspaper for no reason other than that some of its inhabitants may violently disagree with it, and resent its circulation by resorting to physical violence, there is no limit to what may be prohibited." The danger of violent reactions becomes greater with effective organization of defiant groups resenting exposure, and if this consideration warranted legislative interference with the initial freedom of publication, the constitutional protection would be reduced to a mere form of words.

For these reasons we hold the statute, so far as it authorized the proceedings in this action under clause (b)

---

[12] Madison, *op. cit.* p. 549.

of section one, to be an infringement of the liberty of the press guaranteed by the Fourteenth Amendment. We should add that this decision rests upon the operation and effect of the statute, without regard to the question of the truth of the charges contained in the particular periodical. The fact that the public officers named in this case, and those associated with the charges of official dereliction, may be deemed to be impeccable, cannot affect the conclusion that the statute imposes an unconstitutional restraint upon publication.

*Judgment reversed.*

MR. JUSTICE BUTLER, dissenting.

The decision of the Court in this case declares Minnesota and every other State powerless to restrain by injunction the business of publishing and circulating among the people malicious, scandalous and defamatory periodicals that in due course of judicial procedure has been adjudged to be a public nuisance. It gives to freedom of the press a meaning and a scope not heretofore recognized and construes " liberty " in the due process clause of the Fourteenth Amendment to put upon the States a federal restriction that is without precedent.

Confessedly, the Federal Constitution prior to 1868, when the Fourteenth Amendment was adopted, did not protect the right of free speech or press against state action. *Barron* v. *Baltimore,* 7 Pet. 243, 250. *Fox* v. *Ohio,* 5 How. 410, 434. *Smith* v. *Maryland,* 18 How. 71, 76. *Withers* v. *Buckley,* 20 How. 84, 89–91. Up to that time the right was safeguarded solely by the constitutions and laws of the States and, it may be added, they operated adequately to protect it. This Court was not called on until 1925 to decide whether the " liberty " protected by the Fourteenth Amendment includes the right of free speech and press. That question has been finally an-

swered in the affirmative. Cf. *Patterson* v. *Colorado,* 205 U. S. 454, 462. *Prudential Ins. Co.* v. *Cheek,* 259 U. S. 530, 538, 543. See *Gitlow* v. *New York,* 268 U. S. 652. *Fiske* v. *Kansas,* 274 U. S. 380. *Stromberg* v. *California, ante,* p. 359.

The record shows, and it is conceded, that defendants' regular business was the publication of malicious, scandalous and defamatory articles concerning the principal public officers, leading newspapers of the city, many private persons and the Jewish race. It also shows that it was their purpose at all hazards to continue to carry on the business. In every edition slanderous and defamatory matter predominates to the practical exclusion of all else. Many of the statements are so highly improbable as to compel a finding that they are false. The articles themselves show malice.[1]

---

[1] The following articles appear in the last edition published, dated November 19, 1927:

"FACTS NOT THEORIES.

"'I am a bosom friend of Mr. Olson,' snorted a gentleman of Yiddish blood, ' and I want to protest against your article,' and blah, blah, blah, ad infinitum, ad nauseam.

"I am not taking orders from men of Barnett faith, at least right now. There have been too many men in this city and especially those in official life, who HAVE been taking orders and suggestions from JEW GANGSTERS, therefore we HAVE Jew Gangsters, practically ruling Minneapolis.

"It was buzzards of the Barnett stripe who shot down my buddy. It was Barnett gunmen who staged the assault on Samuel Shapiro. It is Jew thugs who have 'pulled' practically every robbery in this city. It was a member of the Barnett gang who shot down George Rubenstein (Ruby) while he stood in the shelter of Mose Barnett's ham-cavern on Hennepin avenue. It was Mose Barnett himself who shot down Roy Rogers on Hennepin avenue. It was at Mose Barnett's place of ' business ' that the ' 13 dollar Jew ' found a refuge while the police of New York were combing the country for him. It was a gang of Jew gunmen who boasted that for five hundred dollars they would kill any man in the city. It was Mose Barnett, a

The defendant here has no standing to assert that the statute is invalid because it might be construed so as to violate the Constitution.  His right is limited solely to

Jew, who boasted that he held the chief of police of Minneapolis in his hand—had bought and paid for him.

" It is Jewish men and women—pliant tools of the Jew gangster, Mose Barnett, who stand charged with having falsified the election records and returns in the Third ward.  And it is Mose Barnett himself, who, indicted for his part in the Shapiro assault, is a fugitive from justice today.

" Practically every vendor of vile hooch, every owner of a moonshine still, every snake-faced gangster and embryonic yegg in the Twin Cities is a JEW.

" Having these examples before me, I feel that I am justified in my refusal to take orders from a Jew who boasts that he is a ' bosom friend ' of Mr. Olson.

"I find in the mail at least twice per week, letters from gentlemen of Jewish faith who advise me against ' launching an attack on the Jewish people.'  These gentlemen have the cart before the horse.  I am launching, nor is Mr. Guilford, no attack against any race, BUT:

" When I find men of a certain race banding themselves together for the purpose of preying upon Gentile or Jew; gunmen, KILLERS, roaming our streets shooting down men against whom they have no personal grudge (or happen to have); defying OUR laws; corrupting OUR officials; assaulting business men; beating up unarmed citizens; spreading a reign of terror through every walk of life, then I say to you in all sincerity, that I refuse to back up a single step from that ' issue '—if they choose to make it so.

" If the people of Jewish faith in Minneapolis wish to avoid criticism of these vermin whom I rightfully call ' Jews ' they can easily do so BY THEMSELVES CLEANING HOUSE.

" I'm not out to cleanse Israel of the filth that clings to Israel's skirts.  I'm out to ' hew to the line, let the chips fly where they may.'

" I simply state a fact when I say that ninety per cent. of the crimes committed against society in this city are committed by Jew gangsters.

" It was a Jew who employed JEWS to shoot down Mr. Guilford.  It was a Jew who employed a Jew to intimidate Mr. Shapiro

the inquiry whether, having regard to the points properly raised in his case, the effect of applying the statute is to deprive him of his liberty without due process of law.

---

and a Jew who employed JEWS to assault that gentleman when he refused to yield to their threats. It was a JEW who wheedled or employed Jews to manipulate the election records and returns in the Third ward in flagrant violation of law. It was a Jew who left two hundred dollars with another Jew to pay to our chief of police just before the last municipal election, and:

" It is Jew, Jew, Jew, as long as one cares to comb over the records.

" I am launching no attack against the Jewish people AS A RACE. I am merely calling attention to a FACT. And if the people of that race and faith wish to rid themselves of the odium and stigma THE RODENTS OF THEIR OWN RACE HAVE BROUGHT UPON THEM, they need only to step to the front and help the decent citizens of Minneapolis rid the city of these criminal Jews.

" Either Mr. Guilford or myself stand ready to do battle for a MAN, regardless of his race, color or creed, but neither of us will step one inch out of our chosen path to avoid a fight IF the Jews want to battle.

" Both of us have some mighty loyal friends among the Jewish people but not one of them comes whining to ask that we ' lay off ' criticism of Jewish gangsters and none of them who comes carping to us of their ' bosom friendship ' for any public official now under our journalistic guns."

" GIL'S [Guilford's] CHATTERBOX.

" I headed into the city on September 26th, ran across three Jews in a Chevrolet; stopped a lot of lead and won a bed for myself in St. Barnabas Hospital for six weeks. . . .

" Whereupon I have withdrawn all allegiance to anything with a hook nose that eats herring. I have adopted the sparrow as my national bird until Davis' law enforcement league or the K. K. K. hammers the eagle's beak out straight. So if I seem to act crazy as I ankle down the street, bear in mind that I am merely saluting MY national emblem.

"All of which has nothing to do with the present whereabouts of Big Mose Barnett. Methinks he headed the local delegation to the new Palestine-for-Jews-only. He went ahead of the boys so

This Court should not reverse the judgment below upon the ground that in some other case the statute may be applied in a way that is repugnant to the freedom of the press protected by the Fourteenth Amendment. *Castillo* v. *McConnico*, 168 U. S. 674, 680. *Williams* v. *Mississippi*, 170 U. S. 213, 225. *Yazoo & Miss. R. Co.* v. *Jackson Vinegar Co.*, 226 U. S. 217, 219–220. *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 544–546.

This record requires the Court to consider the statute as applied to the business of publishing articles that are in fact malicious, scandalous and defamatory.

The statute provides that any person who " shall be engaged in the business of regularly or customarily producing, publishing or circulating " a newspaper, magazine or other periodical that is (a) " obscene, lewd and lascivious " or (b) " malicious, scandalous and defama-

---

he could do a little fixing with the Yiddish chief of police and get his twenty-five per cent. of the gambling rake-off. Boys will be boys and ' ganefs ' will be ganefs."

" GRAND JURIES AND DITTO.

" There are grand juries, and there are grand juries. The last one was a real grand jury. It acted. The present one is like the scion who is labelled ' Junior.' That means not so good. There are a few mighty good folks on it—there are some who smell bad. One petty peanut politician whose graft was almost pitiful in its size when he was a public official, has already shot his mouth off in several places. He is establishing his alibi in advance for what he intends to keep from taking place.

"But George, we won't bother you. [Meaning a grand juror.] We are aware that the gambling syndicate was waiting for your body to convene before the big crap game opened again. The Yids had your dimensions, apparently, and we always go by the judgment of a dog in appraising people.

" We will call for a special grand jury and a special prosecutor within a short time, as soon as half of the staff can navigate to advantage, and then we'll show you what a real grand jury can do. Up to the present we have been merely tapping on the window. Very soon we shall start smashing glass."

tory " is guilty of a nuisance and may be enjoined as provided in the Act. It will be observed that the qualifying words are used conjunctively. In actions brought under (b) " there shall be available the defense that the truth was published with good motives and for justifiable ends."

The complaint charges that defendants were engaged in the business of regularly and customarily publishing " malicious, scandalous and defamatory newspapers " known as the Saturday Press, and nine editions dated respectively on each Saturday commencing September 25 and ending November 19, 1927, were made a part of the complaint. These are all that were published.

On appeal from the order of the district court overruling defendants' demurrer to the complaint the state supreme court said (174 Minn. 457, 461; 219 N. W. 770):

" The constituent elements of the declared nuisance are the customary and regular dissemination by means of a newspaper which finds its way into families, reaching the young as well as the mature, of a selection of scandalous and defamatory articles treated in such a way as to excite attention and interest so as to command circulation. . . . The statute is not directed at threatened libel but at an existing business which, generally speaking, involves more than libel. The distribution of scandalous matter is detrimental to public morals and to the general welfare. It tends to disturb the peace of the community. Being defamatory and malicious, it tends to provoke assaults and the commission of crime. It has no concern with the publication of the truth, with good motives and for justifiable ends. . . . In Minnesota no agency can hush the sincere and honest voice of the press; but our constitution was never intended to protect malice, scandal and defamation when untrue or published with bad motives or without justifiable ends. . . . It was never the intention of the constitution to afford protec-

tion to a publication devoted to scandal and defamation. . . . Defendants stand before us upon the record as being regularly and customarily engaged in a business of conducting a newspaper sending to the public malicious, scandalous and defamatory printed matter."

The case was remanded to the district court.

Near's answer made no allegations to excuse or justify the business or the articles complained of. It formally denied that the publications were malicious, scandalous or defamatory, admitted that they were made as alleged, and attacked the statute as unconstitutional. At the trial the plaintiff introduced evidence unquestionably sufficient to support the complaint. The defendant offered none. The court found the facts as alleged in the complaint and specifically that each edition "was chiefly devoted to malicious, scandalous and defamatory articles" and that the last edition was chiefly devoted to malicious, scandalous and defamatory articles concerning Leach (mayor of Minneapolis), Davis (representative of the law enforcement league of citizens), Brunskill (chief of police), Olson (county attorney), the Jewish race and members of the grand jury then serving in that court; that defendants in and through the several publications "did thereby engage in the business of regularly and customarily producing, publishing and circulating a malicious, scandalous and defamatory newspaper."

Defendant Near again appealed to the supreme court. In its opinion (179 Minn. 40; 228 N. W. 326) the court said: "No claim is advanced that the method and character of the operation of the newspaper in question was not a nuisance if the statute is constitutional. It was regularly and customarily devoted largely to malicious, scandalous and defamatory matter. . . . The record presents the same questions, upon which we have already passed."

Defendant concedes that the editions of the newspaper complained of are " defamatory *per se.*" And he says: " It has been asserted that the constitution was never intended to be a shield for malice, scandal, and defamation when untrue, or published with bad motives, or for unjustifiable ends. . . . The contrary is true; every person *does* have a constitutional right to publish malicious, scandalous, and defamatory matter though untrue, and with bad motives, and for unjustifiable ends, *in the first instance,* though he is subject to responsibility therefor *afterwards.*" The record, when the substance of the articles is regarded, requires that concession here. And this Court is required to pass on the validity of the state law on that basis.

No question was raised below and there is none here concerning the relevancy or weight of evidence, burden of proof, justification or other matters of defense, the scope of the judgment or proceedings to enforce it or the character of the publications that may be made notwithstanding the injunction.

There is no basis for the suggestion that defendants may not interpose any defense or introduce any evidence that would be open to them in a libel case, or that malice may not be negatived by showing that the publication was made in good faith in belief of its truth, or that at the time and under the circumstances it was justified as a fair comment on public affairs or upon the conduct of public officers in respect of their duties as such. See Mason's Minnesota Statutes, §§ 10112, 10113.

The scope of the judgment is not reviewable here. The opinion of the state supreme court shows that it was not reviewable there, because defendants' assignments of error in that court did not go to the form of the judgment, and because the lower court had not been asked to modify the judgment.

The Act was passed in the exertion of the State's power of police, and this court is by well established rule required to assume, until the contrary is clearly made to appear, that there exists in Minnesota a state of affairs that justifies this measure for the preservation of the peace and good order of the State. *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 79. *Gitlow* v. *New York, supra,* 668–669. *Corporation Commission* v. *Lowe,* 281 U. S. 431, 438. *O'Gorman & Young* v. *Hartford Ins. Co.,* 282 U. S. 251, 257–258.

The publications themselves disclose the need and propriety of the legislation. They show:

In 1913 one Guilford, originally a defendant in this suit, commenced the publication of a scandal sheet called the Twin City Reporter; in 1916 Near joined him in the enterprise, later bought him out and engaged the services of one Bevans. In 1919 Bevans acquired Near's interest, and has since, alone or with others, continued the publication. Defendants admit that they published some reprehensible articles in the Twin City Reporter, deny that they personally used it for blackmailing purposes, admit that by reason of their connection with the paper their reputation did become tainted and state that Bevans, while so associated with Near, did use the paper for blackmailing purposes. And Near says it was for that reason he sold his interest to Bevans.

In a number of the editions defendants charge that, ever since Near sold his interest to Bevans in 1919, the Twin City Reporter has been used for blackmail, to dominate public gambling and other criminal activities and as well to exert a kind of control over public officers and the government of the city.

The articles in question also state that, when defendants announced their intention to publish the Saturday Press, they were threatened, and that soon after the first pub-

lication Guilford was waylaid and shot down before he could use the firearm which he had at hand for the purpose of defending himself against anticipated assaults. It also appears that Near apprehended violence and was not unprepared to repel it. There is much more of like significance.

The long criminal career of the Twin City Reporter— if it is in fact as described by defendants—and the arming and shooting arising out of the publication of the Saturday Press, serve to illustrate the kind of conditions, in respect of the business of publishing malicious, scandalous and defamatory periodicals, by which the state legislature presumably was moved to enact the law in question. It must be deemed appropriate to deal with conditions existing in Minnesota.

It is of the greatest importance that the States shall be untrammeled and free to employ all just and appropriate measures to prevent abuses of the liberty of the press.

In his work on the Constitution (5th ed.) Justice Story, expounding the First Amendment which declares: " Congress shall make no law abridging the freedom of speech or of the press," said (§ 1880):

" That this amendment was intended to secure to every citizen an absolute right to speak, or write, or print whatever he might please, without any responsibility, public or private, therefor, is a supposition too wild to be indulged by any rational man. This would be to allow to every citizen a right to destroy at his pleasure the reputation, the peace, the property, and even the personal safety of every other citizen. A man might, out of mere malice and revenge, accuse another of the most infamous crimes; might excite against him the indignation of all his fellow-citizens by the most atrocious calumnies; might disturb, nay, overturn, all his domestic peace, and embitter his parental affections; might inflict the most distressing punishments upon the weak, the timid, and the inno-

cent; might prejudice all a man's civil, and political, and private rights; and might stir up sedition, rebellion, and treason even against the government itself, in the wantonness of his passions or the corruption of his heart. Civil society could not go on under such circumstances. Men would then be obliged to resort to private vengeance to make up for the deficiencies of the law; and assassination and savage cruelties would be perpetrated with all the frequency belonging to barbarous and brutal communities. It is plain, then, that the language of this amendment imports no more than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always that he does not injure any other person in his rights, person, property, or reputation; and so always that he does not thereby disturb the public peace, or attempt to subvert the government. It is neither more nor less than an expansion of the great doctrine recently brought into operation in the law of libel, *that every man shall be at liberty to publish what is true, with good motives and for justifiable ends.* And with this reasonable limitation it is not only right in itself, but it is an inestimable privilege in a free government. Without such a limitation, it might become the scourge of the republic, first denouncing the principles of liberty, and then, by rendering the most virtuous patriots odious through the terrors of the press, introducing despotism in its worst form." (Italicizing added.)

The Court quotes Blackstone in support of its condemnation of the statute as imposing a previous restraint upon publication. But the *previous restraints* referred to by him subjected the press to the arbitrary will of an administrative officer. He describes the practice (Book IV, p. 152): "To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution [of 1688], is to subject all free-

dom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." [2]

Story gives the history alluded to by Blackstone (§ 1882):

" The art of printing soon after its introduction, we are told, was looked upon, as well in England as in other countries, as merely a matter of state, and subject to the coercion of the crown. It was, therefore, regulated in England by the king's proclamations, prohibitions, charters of privilege, and licenses, and finally by the decrees of the Court of Star-Chamber, which limited the number of printers and of presses which each should employ, and prohibited new publications, unless previously approved by proper licensers. On the demolition of this odious jurisdiction, in 1641, the Long Parliament of Charles the First, after their rupture with that prince, assumed the same powers which the Star-Chamber exercised with respect to licensing books; and during the Commonwealth (such is human frailty and the love of power even in republics!) they issued their ordinances for that purpose, founded principally upon a Star-Chamber decree of 1637. After the restoration of Charles the Second, a statute on the same subject was passed, copied, with some few alterations, from the parliamentary ordinances. The act expired in 1679, and was revived and continued for a few years after the revolution of 1688. Many attempts were made by the government to keep it in force; but it was

---

[2] May, Constitutional History of England, c. IX. Duniway, Freedom of the Press in Massachusetts, cc. I and II. Cooley, Constitutional Limitations (8th ed.) Vol. II, pp. 880–881. Pound, Equitable Relief against Defamation, 29 Harv. L. Rev. 640, 650 et seq. Madison, Letters and Other Writings (1865 ed.) Vol. IV, pp. 542, 543. *Respublica* v. *Oswald*, 1 Dall. 319, 325. Rawle, A View of the Constitution (2d ed. 1829) p. 124. Paterson, Liberty of the Press, c. III.

so strongly resisted by Parliament that it expired in 1694, and has never since been revived."

It is plain that Blackstone taught that under the common law liberty of the press means simply the absence of restraint upon publication in advance as distinguished from liability, civil or criminal, for libelous or improper matter so published. And, as above shown, Story defined freedom of the press guaranteed by the First Amendment to mean that " every man shall be at liberty to publish what is true, with good motives and for justifiable ends." His statement concerned the definite declaration of the First Amendment. It is not suggested that the freedom of press included in the liberty protected by the Fourteenth Amendment, which was adopted after Story's definition, is greater than that protected against congressional action. And see 2 Cooley's Constitutional Limitations, 8th ed., p. 886. 2 Kent's Commentaries (14th ed.) Lect. XXIV, p. 17.

The Minnesota statute does not operate as a *previous* restraint on publication within the proper meaning of that phrase. It does not authorize administrative control in advance such as was formerly exercised by the licensers and censors but prescribes a remedy to be enforced by a suit in equity. In this case there was previous publication made in the course of the business of regularly producing malicious, scandalous and defamatory periodicals. The business and publications unquestionably constitute an abuse of the right of free press. The statute denounces the things done as a nuisance on the ground, as stated by the state supreme court, that they threaten morals, peace and good order. There is no question of the power of the State to denounce such transgressions. The restraint authorized is only in respect of continuing to do what has been duly adjudged to constitute a nuisance. The controlling words are "All persons guilty of such nuisance may be enjoined, as here-

inafter provided. . . . Whenever any such nuisance is committed . . . an action in the name of the State " may be brought " to perpetually enjoin the person or persons committing, conducting or maintaining any such nuisance, *from further committing, conducting or maintaining any such nuisance.* . . . The court may make its order and judgment permanently enjoining . . . defendants found guilty . . . from committing or continuing the acts prohibited hereby, and in and by such judgment, such nuisance may be wholly abated. . . ." There is nothing in the statute [3] purporting to prohibit publications that have not been adjudged to constitute a nuisance. It is fanciful to suggest similarity between the granting or enforcement of the decree authorized by this statute to prevent *further* publication of malicious, scandalous and defamatory articles and the *previous restraint* upon the press by licensers as referred to by Blackstone and described in the history of the times to which he alludes.

---

[3] § 1. Any person who, as an individual, or as a member or employee of a firm, or association or organization, or as an officer, director, member or employee of a corporation, shall be engaged in the business of regularly or customarily producing, publishing or circulating, having in possession, selling or giving away.

(a) an obscene, lewd and lascivious newspaper, magazine, or other periodical, or

(b) a malicious, scandalous and defamatory newspaper, magazine, or other perodical,

is guilty of a nuisance, and all persons guilty of such nuisance may be enjoined, as hereinafter provided.

 *       *       *       *       *

In actions brought under (b) above, there shall be available the defense that the truth was published with good motives and for justifiable ends and in such actions the plaintiff shall not have the right to report [resort] to issues or editions of periodicals taking place more than three months before the commencement of the action.

§ 2. Whenever any such nuisance is committed or is kept, maintained, or exists, as above provided for, the County Attorney of any

The opinion seems to concede that under clause (a) of the Minnesota law the business of regularly publishing and circulating an obscene periodical may be enjoined as a nuisance. It is difficult to perceive any distinction, having any relation to constitutionality, between clause (a) and clause (b) under which this action was brought. Both nuisances are offensive to morals, order and good government. As that resulting from lewd publications constitutionally may be enjoined it is hard to understand why the one resulting from a regular business of malicious defamation may not.

It is well known, as found by the state supreme court, that existing libel laws are inadequate effectively to suppress evils resulting from the kind of business and publications that are shown in this case. The doctrine that measures such as the one before us are invalid because they operate as previous restraints to infringe freedom of press exposes the peace and good order of every community and the business and private affairs of every individual to the constant and protracted false and malicious

---

county where any such periodical is published or circulated . . . may commence and maintain in the District Court of said county, an action in the name of the State of Minnesota . . . to perpetually enjoin the person or persons committing, conducting or maintaining any such nuisance, from further committing, conducting, or maintaining any such nuisance. . . .

§ 3. The action may be brought to trial and tried as in the case of other actions in such District Court, and shall be governed by the practice and procedure applicable to civil actions for injunctions.

After trial the court may make its order and judgment permanently enjoining any and all defendants found guilty of violating this Act from further committing or continuing the acts prohibited hereby, and in and by such judgment, such nuisance may be wholly abated.

The court may, as in other cases of contempt, at any time punish, by fine of not more than $1,000, or by imprisonment in the county jail for not more than twelve months, any person or persons violating any injunction, temporary or permanent, made or issued pursuant to this Act.

assaults of any insolvent publisher who may have purpose and sufficient capacity to contrive and put into effect a scheme or program for oppression, blackmail or extortion.

The judgment should be affirmed.

MR. JUSTICE VAN DEVANTER, MR. JUSTICE McREYNOLDS, and MR. JUSTICE SUTHERLAND concur in this opinion.