791 F.2d 463
 54 USLW 2631
 CITY OF PADUCAH, Plaintiff-Appellant,
v.
INVESTMENT ENTERTAINMENT, INC., et al., Defendants-Appellees.
INVESTMENT ENTERTAINMENT, INC., (No. 85-5092), Beltline News
and Arcade Club, (No. 85-9093), Plaintiffs-Appellees,
v.
CITY OF PADUCAH, et al., Defendants-Appellants.
 Nos. 85-5092, 85-5093.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 8, 1985.
Decided May 28, 1986.
 
 James W. Utter (argued), Paducah, Ky., for plaintiff-appellant.
 Joseph S. Freeland, Paducah, Ky., James Glanville (argued), for defendants-appellees.
 Before MERRITT and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 MERRITT, Circuit Judge.
 
 
 1
 The City of Paducah, Kentucky, appeals the judgment of District Judge Johnstone that Paducah's obscenity abatement ordinance, on its face, establishes a prior restraint of protected speech and thereby unconstitutionally infringes the first amendment rights of plaintiffs Investment Entertainment, Inc. and Beltline News and Arcade Club, sellers of books, magazines, and video tapes. We agree that the ordinance's provision requiring the revocation of the occupational licenses of booksellers and movie theaters dealing in obscenity renders the ordinance invalid.
 
 I.
 
 2
 On June 14, 1983, the City of Paducah enacted an ordinance to control obscene material as defined in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Relying on the city's power to declare and abate public nuisances, the ordinance defines the following as "public nuisances per se" in Paducah: (1) any place where obscene films are publicly exhibited or possessed for exhibition in the regular course of business; (2) any obscene film so exhibited or possessed; (3) any place of business, or portion thereof, where obscene publications constitute a principal part of the stock in trade of the business; and (4) any obscene publication possessed at such a place. The ordinance also defines as "a public nuisance per accidens" all money or other consideration received for the exhibition or sale of such obscene films or publications after the manager of the business receives certified notice of the initiation of proceedings under the ordinance.
 
 
 3
 The key contested provision of the ordinance states that the Paducah Board of Commissioners, upon a specific finding that a public nuisance exists, shall by resolution order a revocation of all licenses and permits that have been issued to the business maintaining the nuisance. This license revocation is subject to judicial confirmation.
 
 
 4
 The Board must then order counsel for the city to bring a civil action against the public nuisance. In addition to license revocation, the ordinance contemplates that the action will seek an order enjoining all persons maintaining the nuisance from possessing or marketing the obscene films or publications at any time in the future, an accounting of all money received in the obscenity business, forfeiture of the obscene materials and the money, and judgment for the city for all costs expended in abating the nuisance. The ordinance provides that the "cost of abatement," which is defined to include investigative costs, court costs, reasonable attorney fees, and printing costs for any trial and appeal, is to be a special assessment against the parcel of land upon which the public nuisance is maintained, but only against the interests of the individuals responsible for maintaining the nuisance. This special assessment is to be collected and enforced by the same means as used for ordinary local property taxes.
 
 
 5
 In June and July of 1983, Paducah police officers purchased obscene magazines and video tapes from businesses operated in Paducah by Investment and Beltline. Counsel for the city wrote a letter to both informing them of the ordinance and of the material purchased by the police officers. The letter gave them notice that public hearings would be held. In August 1983, after a hearing, the Board adopted a resolution finding the material purchased from Investment to be obscene and declaring the business from which the material was purchased to be a public nuisance. In September 1983, the Board adopted a similar resolution concerning Beltline. Thereafter, counsel for the city initiated civil actions in Kentucky state court seeking abatement of the nuisances as provided by the ordinance.
 
 
 6
 Investment and Beltline brought separate suits in the United States District Court for the Western District of Kentucky, both under 42 U.S.C. Sec. 1983 (1982), seeking to have the ordinance declared constitutionally invalid and to have the city enjoined from enforcing the ordinance. Alleging diversity of citizenship, Investment removed the state court enforcement action pending against it to federal district court. Beltline also attempted to remove the enforcement action directed against it to federal court, but removal was denied because there was no diversity of citizenship. The District Court then consolidated all three actions. The parties have raised no issue concerning abstention in the District Court or this Court.
 
 
 7
 Neither Investment nor Beltline challenged the ordinance's definition of obscenity, and both admit that the material seized is obscene within the Miller v. California definition. The District Court granted their motions for summary judgment. It held that because the ordinance's license revocation procedure could result in closing down an entire place of business even though not all the material was obscene, the abatement procedure amounted to a prior restraint of both protected speech and unprotected speech. Judge Johnstone gave this example: Under the ordinance, a movie theater could be closed for repeatedly showing an obscene film on weekends even though the theater showed "The Ten Commandments," "Snow White," and "Gone With the Wind" on week days. The District Court also held that the ordinance's abatement procedure unconstitutionally encouraged businesses to engage in self-censorship because the threat of having an entire place of business "abated" would induce business operators to avoid questionable, but still protected, films and publications. The District Court ruled that this self-censorship arises from the ordinance's use of undefined terms such as "regular course of business," "repeatedly," and "principal part." The court held that in this respect the ordinance was vague and would give business operators no notice of what conduct the ordinance reached.
 
 II.
 
 8
 The ordinance requires the revocation of the business licenses of distributors and exhibitors of obscene material. It therefore restrains future speech of the booksellers and theaters whose licenses are revoked--both obscene and decorous speech. The main issue presented is whether Paducah may use license revocation as a tool to control obscenity.
 
 
 9
 The problem of using licensing to control distribution of printed expression by booksellers and publishers has a long history. Milton's Areopagitica remains the classic argument against the licensing of speech. Writing in 1644, just after the revolution, in response to a parliamentary law reestablishing the use of licensing to control books, Milton takes as his "task ... to show that no ... well instituted state, if they valued books at all, did ever use" "this authentic Spanish policy of licensing books." He argues instead that "the timeliest and most effectual remedy" is subsequent evaluation and seizure if necessary. Among his many arguments, Milton advances the danger to truth and beauty because they are difficult to distinguish from falsity and ugliness (however "much we thus expel of sin, so much we expel of virtue, for the matter of them both is the same") and the problem of the "quality which ought to be in every licenser" ("he who is made judge to sit upon the birth and death of books ... had need to be a man above the common measure, both studious, learned, and judicious". Yet, "there cannot be a more tedious and unchosen journeywork ... than to be made the perpetual reader of unchosen books and pamphlets"). Licensing speech discourages new ideas ("I found and visited the famous Galileo, grown old, a prisoner to the Inquisition, for thinking in astronomy otherwise than the Franciscan and Dominican licensers thought"); undermines expression as a value in itself ("[g]ive me the liberty to know, to utter, and to argue freely according to conscience, above all liberties"); and raises the prospect of manipulation and misinformation when we "pretend to bind books to their good behavior" ("for what magistrate may not be misinformed, and much the sooner, if liberty of printing be reduced into the power of a few?").
 
 
 10
 By the late Eighteenth Century, Milton's view against licensing had become the English common law rule against prior restraint, as reflected in Blackstone's Commentaries:
 
 
 11
 The liberty of the press is indeed essential to the nature of a free state: but this consists in laying no previous restraints upon publications.... To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points of learning, religion, and government.[1]
 
 
 12
 The British common law against licensing publishers and booksellers was part of the foundation for the first amendment's guarantee of freedom of the press. See Z. Chafee, Free Speech in the United States 10-12 (1942) (arguing that the Blackstonian view of freedom of the press--freedom from prior restraint--was part, but only part, of the freedom that the first amendment had come to guarantee).
 
 III.
 
 13
 Modern first amendment jurisprudence has followed Milton and Blackstone on prior restraint. As the District Court noted, the law has dealt with the licensing problem by focusing on whether the use of licensing constitutes a prior restraint of protected expression. The major case on prior restraint is Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In Near the Court invalidated, as a prior restraint, an injunction entered against a newspaper under a Minnesota statute providing that any newspaper publishing malicious, scandalous, or defamatory material is a nuisance and can be permanently enjoined. Chief Justice Hughes, quoting Blackstone, pointed out that part of the first amendment grew out of the struggle in Britain against the "legislative power of the licenser" of the press. Id. at 713-14, 51 S.Ct. at 630. The Court held that if "the object of the statute is not punishment, in the ordinary sense, but suppression of the offending newspaper or periodical" in the future, and "the statute not only operates to suppress the offending newspaper or periodical but to put the publisher under an effective censorship," 283 U.S. at 709-12, 51 S.Ct. at 628-29, then the statute constitutes a prior restraint.
 
 
 14
 The City of Paducah's argument that its licensing ordinance is not a prior restraint is similar to Justice Butler's argument for the four dissenters in Near. Paducah, one might argue, is only revoking a previously issued business license, and when the licenses are issued they are completely unrelated to the regulation of speech. Later revocation is for abuse of the occupational license.
 
 
 15
 Likewise, Justice Butler argued that prior restraint consists of licensing publishers and their books as an original matter, not of later revocation for abuse of the right. Later revocation "does not operate as a previous restraint on publication within the proper meaning of that phrase" because it "is only in respect of continuing to do what what has been duly adjudged to constitute a nuisance." Id. at 735, 51 S.Ct. 638 (emphasis in original). "It is fanciful to suggest similarity between ... the decree ... to prevent further publication of malicious, scandalous, and defamatory articles and the previous restraint upon the press by licensers as referred to by Blackstone...." Id. at 736, 51 S.Ct. at 638 (emphasis in original). Chief Justice Hughes and the majority of the Court rejected this argument--"that the constitutional freedom from previous restraint is lost because charges are made of derelictions which constitute crimes"--dereliction because "[the argument] is inconsistent with the reason which underlies the privilege." Id. at 720-21, 51 S.Ct. at 632-33.
 
 
 16
 Several federal and state courts have addressed the first amendment question presented by state laws and local ordinances that use the nuisance abatement power to control obscenity. Laws on this subject differ in approach. Some, as in the instant case, abate the nuisance by revoking the offending business' general business license. Others, the so-called "padlock" laws, call for a judicially ordered temporary or permanent injunction under which local authorities close the place of business and do not allow its owners to operate out of that location for the duration of the injunction.
 
 
 17
 We have found no precedent in which courts have upheld an obscenity law that provided for the revocation of obscenity dealers' business licenses. In at least three instances, federal courts have held local obscenity ordinances that use the revocation of licenses and permits to be unconstitutional prior restraints of protected speech. Gayety Theatres, Inc. v. Miami, 719 F.2d 1550 (11th Cir.1983); Entertainment Concepts, Inc. III v. Maciejewski, 631 F.2d 497 (7th Cir.1980); cert. denied, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981); Cornflower Entertainment, Inc. v. Salt Lake City Corp., 485 F.Supp. 777 (D.Utah 1980); see also Genusa v. City of Peoria, 619 F.2d 1203, 1213-15 (7th Cir.1980) (requirement that adult bookstore license applicant submit to inspection of premises was held unconstitutional). But cf. Young v. American Mini Theatres, Inc., 427 U.S. 50, 62-63, 96 S.Ct. 2440, 2448-49, 49 L.Ed.2d 310 (1976) (adult movie theaters may be licensed if licensing is necessary to valid zoning and locational requirements); Genusa, 619 F.2d at 1212-13 (same for adult bookstores). The Supreme Court has not ruled directly on the licensing issue in an obscenity case.
 
 
 18
 The padlock cases are also pertinent, although not directly on point. The results in the padlock and other similar cases have varied. The Supreme Court has never ruled on the question of whether a padlock obscenity law is an unconstitutional prior restraint.[2] Because this is a license revocation ordinance case, we need not give an opinion on the padlock laws which are usually less intrusive than license revocation. But a review of a few of the cases is instructive.
 
 
 19
 In Universal Amusement Co. v. Vance, 587 F.2d 159 (5th Cir.1978), the Fifth Circuit held that a nuisance statute's provision for temporary closure of businesses distributing obscene material was an unconstitutional prior restraint of business operators' rights to engage in protected expression during the closure period. The Supreme Court affirmed at 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), but, in affirming, the Court aimed its per curiam opinion at the fact that under the statute a prosecutor could obtain a temporary restraining order and preliminary injunction against showing certain named and unnamed films before judicial determination that the films were indeed obscene. 445 U.S. at 316 n. 14, 100 S.Ct. at 1161. The Court held that this procedure was an unconstitutional prior restraint.[3] Several other courts have held padlock obscenity laws invalid. See Cornflower Entertainment, Inc. v. Salt Lake City Corp., 485 F.Supp. 777 (D. Utah 1980); People ex rel. Busch v. Projection Room Theater, 17 Cal.3d 42, 130 Cal.Rptr. 328, 550 P.2d 600, cert. denied sub nom., Van De Kamp v. Projection Room Theater, 429 U.S. 922, 97 S.Ct. 320, 50 L.Ed.2d 289 (1976); State v. A Motion Picture Entitled "The Bet," 219 Kan. 64, 547 P.2d 760 (1976); see also Note, Pornography, Padlocks, and Prior Restraints: The Constitutional Limits of the Nuisance Power, 58 N.Y.U.L. Rev. 1478, 1489 (1983) ("courts generally have assumed that padlock orders are prior restraints without engaging in substantial analysis under prior restraint doctrine.").[4]
 
 
 20
 On the other hand, several state courts have held that padlock laws aimed at businesses involved in the sale or exhibition of obscene material are not prior restraints. In State ex rel. Kidwell v. U.S. Marketing, Inc., 102 Idaho 451, 631 P.2d 622 (1981), appeal dismissed sub nom., U.S. Marketing, Inc. v. Idaho, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982), the Idaho Supreme Court dealt with a state nuisance law providing that if a business is engaged in selling or exhibiting obscene material, the real property used in the business is forfeited for a period of one year. The defendant argued that this forced forfeiture constituted an unconstitutional prior restraint on business operators' first amendment rights to engage in protected, nonobscene expression. The court noted that under Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), the state could punish purveyors of obscene material and that the state was not limited to criminal sanctions as a weapon against obscenity. Kingsley Books v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469 (1957). The court held that the purpose of the nuisance law was to deter dealing in obscenity, and, in response to the prior restraint argument, it stated:By way of example, if a bookseller, having fallen behind on his property taxes, loses his bookstore at a tax sale, he will not be heard to complain that the state has imposed an unlawful prior restraint upon his bookselling activities. If that same bookseller is convicted of the crime of distributing obscene materials, he may be imprisoned, and yet he will not be heard to complain that his incarceration constitutes a prior restraint upon his ability to disseminate protected speech, even though it is quite clear that it has that effect.
 
 
 21
 ....
 
 
 22
 The one-year forfeiture provision of the Idaho moral nuisance statute avoids the particularly noxious specter of content control. Like a tax sale, the forfeiture is directed strictly at property, apart from the content of any expression contained therein. And like imprisonment for a criminal obscenity transgression, the forfeiture is intended to penalize past distributions of illegal and unprotected obscenity. The legislature could just as easily have imposed a fine or other property-related penalty. Instead, the legislature chose to punish the violator by temporarily depriving him of the property which was used in committing the violation.
 
 
 23
 631 P.2d at 627-28.
 
 
 24
 Under this line of analysis, similar to Justice Butler's argument in dissent in Near, if the nuisance abatement procedure is seen as a means of deterring or punishing purveyors of obscene material, preventing a business operator from selling or exhibiting any publications or films in the future is no more of a prior restraint than closing his business for drug or weapons violations would be. Along these lines see State ex rel. Calahan v. Diversified Theatrical Corp., 59 Mich.App. 223, 229 N.W.2d 389 (1975), rev'd on other grounds, 396 Mich. 244, 240 N.W.2d 460 (1976).
 
 IV.
 
 25
 As noted by the Idaho Supreme Court in Kidwell, not all laws that have the effect of preventing a person from engaging in protected expression in the future are prior restraints as that term has been developed. Assuming a valid statute, the state of Kentucky could incarcerate a person who is properly convicted of violating Kentucky's obscenity statute. See Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966) (upholding conviction for violation of federal obscenity statute; defendant had been sentenced to serve five years) and Ky.Rev.Stat. Sec. 531.020 (1985) (distributing two pieces of obscene matter is a class A misdemeanor in Kentucky, which may result in imposition of up to a one-year jail sentence). If a bookstore operator were convicted for selling obscene material in his store and were sentenced to serve time in the state prison, his ability to continue to personally sell nonobscene books in his store would be foreclosed for the duration of his incarceration. But it is doubtful that he could make a valid argument that the state law under which he was incarcerated is a prior restraint of his right to engage in protected expression by selling nonobscene books.
 
 
 26
 Similarly, it is doubtful that he could make a valid argument that a nuisance abatement law applied to obscenity is an unconstitutional prior restraint if the law is narrowly structured as a deterrent or punishment of purveyors of obscenity. If, on the other hand, the abatement procedure focuses on regulating the future speech of a defendant who has been adjudged "guilty" of distributing obscene material, the law is tantamount to a licensing statute establishing a prior restraint of the defendant's first amendment right to engage in nonobscene expression. To use the language of Near v. Minnesota, a nuisance abatement procedure applied to obscenity should be upheld if "[t]he object of the [procedure] is punishment, in the ordinary sense, [rather than] suppression of the offending [business]" and if the procedure does not "operat[e] to ... put the publisher under an effective censorship." 283 U.S. at 709-12, 51 S.Ct. at 628-30.
 
 
 27
 No doubt one of the purposes of Paducah's license revocation ordinance is to deter the sale and exhibition of obscene material. But the ordinance goes beyond this purpose as District Judge Johnstone found. The main thrust of the abatement procedure is the revocation of all licenses and permits under which the business in question operates. Even under the so-called padlock laws, a business operator remains free to engage in protected expression in another location. Paducah's procedure of revoking business licenses is more restrictive in that it essentially prevents the offending business from engaging in future distribution of protected, nonobscene material anywhere within the City of Paducah. We therefore conclude that the ordinance's use of license revocation as a weapon against obscenity goes beyond merely deterring or punishing individuals who deal in obscene material. The ordinance's purpose, as evidenced by the license revocation provision, is to control future expression by businesses that have been subjected to the nuisance abatement procedure. The ordinance is a prior restraint of plaintiff's freedom of expression.
 
 
 28
 Of course, not all prior restraints of free speech are unconstitutional. But none of the exceptions are present here. In order to be valid, a system imposing a temporary prior restraint must implement certain procedural safeguards required by Supreme Court precedent. These safeguards are drawn from Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), and more recently from Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 560, 95 S.Ct. 1239, 1247, 43 L.Ed.2d 448 (1975), in which the Court stated:
 
 
 29
 First, the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor. Second, any restraint prior to judicial review can be imposed only for a specified brief period and only for the purpose of preserving the status quo. Third, a prompt final judicial determination must be assured.
 
 
 30
 As to the obscene material whose sale or exhibition triggered the application of Paducah's ordinance, the safeguards are adequate. Or, more accurately, there is no restraint at all before a judicial hearing is conducted, since the sale and exhibition of the material is not restrained until after a judicial determination that the material is indeed obscene.[5] As discussed above, however, the license revocation procedure would still operate as a prior restraint on plaintiffs' future distribution of nonobscene expression.
 
 
 31
 Neither the parties nor the District Court has addressed the possibility that the ordinance's unconstitutional use of license revocation may be severable from the remainder of the ordinance. In the absence of argument on the issue, we also decline to address the severability question. The ordinance violates plaintiffs' first amendment right of freedom of expression. Accordingly, we hold the ordinance facially invalid, and we affirm the District Court's judgment.
 
 
 32
 WELLFORD, Circuit Judge, concurring.
 
 
 33
 The City of Paducah originally sought to enforce the ordinance in question against Beltline News and Arcade Club (Beltline) and against the other defendant, Investment Entertainment, Inc. (Investment), in state court. The action against the latter was successfully removed by Investment to federal district court, but the other is pending against Beltline in state court. The defense of abstention was presented by the City in its answer to Investment's complaint and amended complaint in the district court. This is the kind of factual situation in which abstention may be appropriate because the ordinance's scheme contemplates a full state court hearing before revocation of defendants' operating licenses and privileges becomes effective. State courts are fully competent to hear and to consider the constitutional challenges, federal and state, here made to the procedures involved in the disputed ordinance. The state court, of course, may first test the ordinance and its procedure under standards of the Kentucky Constitution; accordingly, it might avoid the necessity of a decision on the federal Constitution in a complex and difficult area.
 
 
 34
 Reflected among the concerns which have traditionally counseled a federal court to stay its hand are the desirability of avoiding unseemly conflict between the two sovereignties, the unnecessary impairment of state functions, and the premature determination of constitutional questions.
 
 
 35
 Martin v. Creasy, 360 U.S. 219, 224, 79 S.Ct. 1034, 1037, 3 L.Ed.2d 1186 (1959).
 
 
 36
 In Martin, the Court noted that the Pennsylvania law challenged as unconstitutional had not yet been construed by state courts, and there was "no reason to suppose that the Commonwealth of Pennsylvania will not accord full constitutional scope...." Id. at 225, 79 S.Ct. at 1037. This case would have been an appropriate vehicle for abstention since the district court might have awaited a decision of the state court in Beltline before deciding the sensitive federal constitutional issue in Investment. However, because the City did not actively pursue the abstention issue before this court and has apparently not urged the state court promptly to render a decision in Beltline, this issue has been waived, although initially suggested by the City in its answer to the federal action. See Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 479-80, 97 S.Ct. 1898, 1903-04, 52 L.Ed.2d 513 (1977).
 
 
 37
 The difficulty in this area of the law is well expressed in the various viewpoints of the Justices set out in Vance v. Universal Amusement Co., 445 U.S. 308, 320, 100 S.Ct. 1156, 1163, 63 L.Ed.2d 413 (1980). Perhaps the Supreme Court will determine whether an abatement or revocation of the kind contemplated in the Paducah ordinance will pass constitutional muster in deciding the case now pending before it for disposition, People ex rel. Arcara v. Cloud Books, Inc., 119 Misc.2d 505, 465 N.Y.S.2d 633, later proceeding, 96 A.D.2d 751, 465 N.Y.S.2d 699 (1983), aff'd, 101 A.D.2d 163, 475 N.Y.S.2d 173 (1984), certified question answered and modified, 65 N.Y.2d 324, 491 N.Y.S.2d 307, 480 N.E.2d 1089, cert. granted, --- U.S. ----, 106 S.Ct. 379, 88 L.Ed.2d 333 (1985).
 
 
 38
 I emphasize, on the merits of this case, as found by Judge Merritt, that the procedural safeguards of the Paducah ordinance appear to be adequate solely in respect of the allegedly obscene materials because there is no prior restraint involved with regard to any claimed first amendment freedom of expression until after a judicial determination has been made on obscenity. It is the future effect of revocation of an operating license, the remedy that is provided, that is especially troublesome in this case.
 
 
 39
 We have recently stated with respect to a city ordinance dealing with an effort to control what was deemed to be potential obscene conduct in licensed clubs through revocation of an occupational license:
 
 
 40
 We hold further that the ordinance does not constitute an impermissible prior restraint upon either present or future restricted expression. The appellants' argument that their zoning status would be altered if their occupational licenses were revoked does not constitute a reason to invalidate the ordinance as a prior restraint. In this case, prescreening discretion is not vested in any administrative body, as in Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and the dangers of censorship are not present.
 
 
 41
 Iacobucci v. City of Newport, Ky., 785 F.2d 1354, 1359 (6th Cir.1986) (emphasis added).
 
 
 42
 I do not harbor the serious reservations of Judge Merritt that obscenity ordinances may not, under any circumstances, validly revoke a business license of one dealing in obscenity, properly defined, in a particular location. A permanent revocation of license may be too broad a sanction in the situation before us. I have no problem, as did the district court, with the words "regular course of business" and "repeatedly" as used in the ordinance in question. I do not find them "vague" or overbroad, examined in context with their use in the ordinance.
 
 
 43
 I concur in the result reached by Judge Merritt in this case. I do not, however, adopt the rationale of J-R Distributors, Inc. v. Eikenberry, 725 F.2d 482 (9th Cir.1984), rev'd on other grounds sub nom., Brockett v. Spokane Arcades, Inc., --- U.S. ----, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985).
 
 
 
 [1]
 4 W. Blackstone, Commentaries * 151-52 (emphasis in original). Blackstone described the history of printer licensing in England:
 The art of printing, soon after it's introduction, was looked upon (as well in England as in other countries) as merely a matter of state, and subject to the coercion of the crown. It was therefore regulated with us by the king's proclamations, prohibitions, charters of privilege and of licence, and finally by the decrees of the court of starchamber; which limited the number of printers, and of presses which each should employ, and prohibited new publications unless previously approved by proper licensers. On the demolition of this odious jurisdiction in 1641, the long parliament of Charles I, after their rupture with that prince, assumed the same powers as the starchamber exercised with respect to the licensing of books; and in 1643, 1647, 1649, and 1652, (Scobell. i. 44, 134, ii. 88, 230.) issued their ordinances for that purpose, founded principally on the starchamber decree of 1637. In 1662 was passed the statute 13 & 14 Car. II. c. 33. which (with some few alterations) was copied from the parliamentary ordinances. This act expired in 1679, but was revived by statute I. Jac. II. c. 17, and continued till 1692. It was then continued for two years longer by statute 4 W. & M. c. 24, but, though frequent attempts were made by the government to revive it, in the subsequent part of that reign, (Com. Journ. 11 Feb.1694, 26 Nov.1695, 22 Oct.1696. 9 Feb.1697, 31 Jan.1698.) yet the parliament resisted it so strongly, that it finally expired, and the press became properly free, in 1694; and has ever since so continued.
 Id. at * 152 n. 2.
 
 
 [2]
 See Avenue Book Store v. City of Tallmadge, 459 U.S. 997, 998, 103 S.Ct. 356, 357, 74 L.Ed.2d 393 (1982) (White, J., dissenting to the Supreme Court's denial of certiorari, quoted infra note 3)
 
 
 [3]
 See Justice White's dissent in which he argues that the Court misunderstood the statute's provision dealing with an injunction to be issued after judicial determination that the material involved was obscene. 445 U.S. at 320-25, 100 S.Ct. at 1163-66. See also the dissent to the Supreme Court's denial of certiorari in Avenue Book Store in which Justice White states:
 In Vance v. Universal Amusement Co., 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), the Court upheld a finding that a Texas public nuisance statute authorized an unconstitutional "prior restraint for indefinite duration on the exhibition of motion pictures without a final judicial determination of obscenity and without any guarantee of prompt review of a preliminary finding of probable obscenity." Id. at 309, 100 S.Ct. at 1157. Fatal to that statute were particular procedural infirmities of the Texas nuisance scheme whereby the subject of an abatement order or injunction "would be subject to contempt proceedings even if the film [was] ultimately found to be nonobscene." Id. at 316, 100 S.Ct. at 1161.
 The Court has never determined, however, whether abatement orders, such as the one involved in the present case, will pass constitutional muster when they permanently enjoin the use of a business premises for the sale or display of obscene material, but do not subject the owner to contempt sanctions unless there has been a judicial determination of obscenity.
 459 U.S. at 998, 103 S.Ct. at 357 (White, J., dissenting).
 
 
 [4]
 Accord J.R. Distributors, Inc. v. Eikenberry, 725 F.2d 482 (9th Cir.1984), rev'd on other grounds sub nom., Brockett v. Spokane Arcades, Inc., --- U.S. ----, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). In Eikenberry the Ninth Circuit stated as dictum (see 105 S.Ct. at 2797 n. 5; 725 F.2d at 498 (Wallace, J., dissenting)) that an obscenity abatement law's provision requiring forfeiture of profits derived from the sale of both obscene and nonobscene material unconstitutionally restricted free speech rights in the nonobscene material
 
 
 [5]
 The parties have not argued the possibility that in an enforcement action Paducah might obtain, under Kentucky state court procedures, a temporary restraining order directed at allegedly obscene material before the material had been judicially adjudged obscene. We note that the majority of the Supreme Court spoke to such a procedure in Vance v. Universal Amusement, 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), but that is not an issue here