768 P.2d 175

**STATE of Arizona, Appellee,**

v.

**Gary M. BAUER and Yoco Enterprises, Inc., Appellants.**

**Nos. 1 CA–CR 11628, 1 CA–CR 11631.**

Court of Appeals of Arizona, Division 1, Department C.

Dec. 13, 1988.

Review Denied March 14, 1989.

**444**

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Criminal Div., Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, for appellee.

Nancy L. Hinchcliffe, Phoenix, and Robert E. Smith, Universal City, California, for appellants.

## OPINION

BROOKS, Judge.

Appellants Gary Bauer and Yoco Enterprises, Inc., doing business as Castle Adult Bookstore (defendants), were charged by indictment with seven counts of production, publication, sale, and possession for distribution of obscene items, all class 6 felonies. The charges stemmed from the sale or rental of four videocassette films.

The first trial ended in a mistrial, with the jury informing the trial court that it could not reach a verdict on any of the seven counts. On retrial, the prosecution

elected to proceed on only five counts in connection with two films, "Loose Ends" and "Divine Atrocities." At the conclusion of the second trial, the jury found that "Loose Ends" was not obscene and defendants were acquitted of the charges relating to that film. However, the jury found each defendant guilty of two counts of production, publication, sale, or possession of an obscene film in connection with the rental of "Divine Atrocities," in violation of A.R. S. § 13–3502 (1978) (current version in Supp.1987).

At the mitigation/sentencing hearing, the trial court found that Gary Bauer and Yoco Enterprises, Inc., were one and the same and designated all four counts, two against Bauer and two against Yoco, as class 6 felonies. After considering the mitigating circumstances, the court sentenced Bauer, individually, and on behalf of Yoco, to three years probation. As a term of probation, the court imposed a fine of $27,-400 jointly upon both defendants. Further, pursuant to statute, the trial court ordered that defendants forfeit all permits and licenses issued to either of them by the State of Arizona or its political subdivisions.

Defendants timely appealed the convictions and terms of probation, challenging the constitutionality of the Arizona obscenity statutes, A.R.S. § 13–3501 *et seq.*, and related jury instructions, as well as the validity of the term of probation requiring the license forfeitures. By order of this court, these separate appeals were consolidated. We affirm the convictions but vacate the terms of probation and remand for imposition of new terms of probation.

### PRELIMINARY PRINCIPLES

■ We begin by noting that motion pictures are as fully protected by the First Amendment as are other mediums of expression. *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). However, obscenity is not within the area of constitutionally protected speech. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957);

*Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *State v. Book–Cellar, Inc.,* 139 Ariz. 525, 679 P.2d 548 (App.1984).

In *Miller,* the Supreme Court established guidelines to be used by the trier of fact when determining whether or not an item is obscene: (a) whether the average person, applying contemporary community standards, would find that the item as a whole appeals to the prurient interest; (b) whether the item depicts, in a way that is patently offensive, sexual conduct as specifically defined by state law; and (c) whether the item as a whole lacks serious literary, artistic, political, or scientific value. 413 U.S. at 24, 93 S.Ct. at 2615, 37 L.Ed.2d at 431. Arizona Revised Statutes § 13–3501(2), which defines obscenity, adopts the *Miller* test.[1]

### THE JURY INSTRUCTIONS

■ The trial court in the instant case instructed the jury on the definition of obscenity, quoting A.R.S. § 13–3501(2) verbatim:

An item is obscene when (A) the average person applying contemporary state standards would find that the item, taken as a whole, appeals to the prurient interest; and (B) the item depicts or describes, in a patently offensive way, sexual activity as that term is described herein; and (C) the item taken as a whole lacks serious literary, artistic, political or scientific value.

The trial court also instructed the jury on the definition of "prurient interest" as follows:

The term "appeal to the prurient interest" means an appeal to an unhealthy, unwholesome, morbid, degrading or shameful interest in sex or nudity. An interest in sex is normal. But if the material appeals to an abnormal interest in sex, it can appeal to the prurient interest. A prurient interest in sex is not the same as a candid wholesome or healthy interest in sex. Material does not appeal

1. The statute has been recently amended to reflect current refinements in this area of law. *See* Laws, 1986, Ch. 411, § 1. These changes do not affect our analysis.

to the prurient interest just because it deals with sex or shows nude bodies. Prurient interest is an unhealthy, unwholesome, morbid, degrading or shameful interest in sex, a leering or longing interest. An appeal to the prurient interest is an appeal to sexual desire, not an appeal to sexual interest. An interest in sex is normal, but if the material appeals to an abnormal interest in sex, it can appeal to a prurient interest.

Defendants contend that the trial court improperly instructed the jury on the definition of "prurient interest." They argue that "prurient interest" cannot encompass "lust" or carry any connotation of a normal, healthy interest in sex. In order to pass constitutional muster, they argue, "prurient interest" must be confined to terms of an "abnormal, unhealthy, unwholesome, morbid, degrading, or shameful" interest in sex.

We recognize the rule of law that "prurient interest" must not include sexual interests that are "healthy, wholesome, human reaction[s] common to millions of well-adjusted persons in our society." *J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482, 490 (9th Cir.1984), *rev'd on other grounds sub nom. Brockett v. Spokane Arcades*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). Contrary to defendants' argument, there is no mention of the words "lust" or "lustful desires" in the instruction. In fact, the trial court specifically refused to use the term "lust" after a request to do so by the state. We conclude that, when read as whole, the instruction is sufficient to inform the jury that "prurient" means an unwholesome, morbid, degrading, or shameful interest in sex. *See State v. Bartanen*, 121 Ariz. 454, 591 P.2d 546, *cert. denied*, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979).

Defendants next argue that the trial court's instruction on the third prong of the *Miller* test, whether the item lacks serious literary, artistic, political, or scientific value, was improper in light of the United States Supreme Court's recent decision in *Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987). We find no error.

In *Pope*, the jury was instructed that in determining whether the material was obscene, it had to apply "contemporary community standards" to all three prongs of the *Miller* test. However, the Supreme Court held that the proper inquiry with respect to the third part of the *Miller* test is "not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in the alleged obscene material, but whether a *reasonable person* would find such value in the material, taken as a whole." *Id.* 481 U.S. at 500–501, 107 S.Ct. at 1921, 95 L.Ed. 2d at 445 (emphasis added).

In the instant case, the record reveals nothing which would suggest that the trial court improperly instructed the jury that the third part of the *Miller* test for obscenity must be judged by reference to community standards. To the contrary, the trial court specifically instructed the jury that contemporary state standards applied only to the questions of appeal to prurient interest and patent offensiveness, the first two parts of the *Miller* test. When the court instructed the jury on the third part, it stated:

> Another part of the statutory test for obscenity, requires the jury to find whether material taken as a whole lacks serious literary, artistic, political, or scientific value.

> Though serious value or the lack of it is *not determined in terms of contemporary state standards*, evidence of catering to prurient interest in the creation, promotion, or dissemination of material is relevant in determining whether the material has any such claimed serious value.

(Emphasis added.) As noted by this court in *State v. Feld*, 155 Ariz. 88, 91 n. 1, 745 P.2d 146, 149 n. 1 (App.1987), *cert. denied*, 485 U.S. ——, 108 S.Ct. 1270, 99 L.Ed.2d 482 (1988), the third part of the *Miller* test found in A.R.S. § 13–3501(2) must be analyzed according to the reasonable person standard articulated in *Pope*, which is entirely consistent with the language of our

statute. In fact, although *Pope* had yet to be decided, the defendants in the instant case attempted to inject into the trial court proceedings the very idea that was rejected in *Pope*.

> MR. SMITH [Counsel for defendants]: ... we would ask the court and we will give you a written instruction tomorrow morning, your Honor, for the record—
> THE COURT: Yes.
> MR. SMITH: —that will ask you to charge the concept of serious value in the light of contemporary community standards of acceptance or tolerance.

The trial court correctly declined to outguess the Supreme Court's decision in *Pope* and refused to give the instruction. We find no error as the trial court correctly applied the law.

### CONSTITUTIONALITY OF THE ARIZONA OBSCENITY STATUTES

Defendants also challenge the constitutional validity of Arizona's obscenity statutes, claiming that the definition of obscenity is "unconstitutionally overbroad, both on its face and as applied." They argue that the definition includes within its reach material that appeals to a normal interest in nudity or sex. We take this to mean that defendants challenge the statutory term "prurient interest" as being overbroad on its face and as interpreted by the Arizona Supreme Court in *State v. Bartanen*, 121 Ariz. 454, 591 P.2d 546, *cert. denied*, 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979). We reject both of these contentions.

In interpreting statutes, courts should, if possible, give the disputed statute a constitutional construction and uphold that statute even though it may have been inartfully drawn. *See generally State v. Grijalva*, 111 Ariz. 476, 533 P.2d 533, *cert. denied*, 423 U.S. 873, 96 S.Ct. 141, 46 L.Ed.2d 104 (1975); *State v. Book-Cellar, Inc.*, 139 Ariz. at 528, 679 P.2d at 551. An overbroad statute is "one that is designed to burden or punish activities which are not constitutionally protected, but [that] includes within its scope activi-

ties which are protected by the first amendment." *Hill v. City of Houston*, 764 F.2d 1156, 1161 (5th Cir.1985), *aff'd on rehearing*, 789 F.2d 1103 (5th Cir.1986) (en banc), *aff'd*, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed. 2d 398 (1987).

We first note that A.R.S. § 13–3501 does not define "prurient." It does, however, mirror the *Miller* decision. Obscenity statutes which meet the guidelines set forth in *Miller* but leave the word "prurient" undefined or defined by case law have been upheld. *See People v. Sequoia Books, Inc.*, 160 Ill.App.3d 315, 112 Ill.Dec. 54, 513 N.E.2d 468 (1987), *cert. denied*, —— U.S. ——, 109 S.Ct. 175, 102 L.Ed.2d 144 (1988); *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020 (5th Cir.1981), *cert. denied sub nom. Theatres West, Inc. v. Holmes*, 455 U.S. 913, 102 S.Ct. 1264, 71 L.Ed.2d 453 (1982); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 505 & n. 13, 105 S.Ct. 2794, 2802 & n. 13, 86 L.Ed.2d 394, 407 & n. 13 (1985). Thus, the lack of a statutory definition of "prurient" does not make the Arizona statute facially overbroad.

Since the term "prurient" in Arizona has been defined in case law, rather than statute, we perceive defendants' constitutional attack not to be aimed at the lack of a statutory definition, but at the construction given the statute in *State v. Bartanen*. In *Bartanen*, our supreme court affirmed an interpretation of "prurient interest" submitted in a jury instruction which contained the words "having lustful ideas or desires." However, the court noted that the *Bartanen* jury instructions contained a detailed explanation of prurience, expressly differentiating between "prurience" and an interest in sex which is candid, wholesome, and healthy. Therefore, the court found that the instructions, read as a whole, were adequate to inform the jury that "prurient interest" was a morbid or shameful interest in sex.

The identical argument presented by defendants herein was considered and rejected in *Polykoff v. Collins*, 816 F.2d 1326 (9th Cir.1987). There, several plaintiffs sought declaratory relief and an injunction restraining the Maricopa County Attorney

from enforcing the Arizona obscenity statute against them. They alleged that it was unconstitutionally overbroad on its face because the *Bartanen* definition of "prurient interest" encompassed expression protected by the First Amendment. The district court denied relief and the Ninth Circuit affirmed, finding that the statute was neither overbroad on its face, nor as construed by the Arizona Supreme Court.

The *Polykoff* court relied on *J–R Distributors, Inc. v. Eikenberry*, 725 F.2d 482 (9th Cir.1984), *rev'd on other grounds sub nom. Brockett v. Spokane Arcades*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985). In *J–R Distributors/Spokane Arcades*, the Ninth Circuit invalidated an entire Washington obscenity statute because it used "lust" to define "prurient interest." The court found that "lust" may encompass normal, healthy emotions and therefore would not be within the ambit of "prurient." On appeal, the Supreme Court held, given the court's finding as to the term "lust," that the Ninth Circuit improperly invalidated the entire statute. Partial invalidation was appropriate, the Court held, but "only insofar as the word 'lust' is to be understood as reaching protected materials." 472 U.S. at 504, 105 S.Ct. at 2802, 86 L.Ed.2d at 406. Consequently, the Court reversed and remanded the case. However, on remand the case was settled. *Polykoff*, 816 F.2d at 1336. The issue of whether the term "lust" did in fact encompass normal, healthy emotions was never finally decided by the Ninth Circuit. Therefore, the thrust of *J–R Distributors/Spokane Arcades*, is that the term "lust" *may* encompass both protected and non-protected expression.

The *Polykoff* court used this principle in scrutinizing the *Bartanen* jury instructions. It noted that the *Bartanen* instructions included an ALI, Model Penal Code definition of "prurient" which was approved in *Roth*, 354 U.S. at 487 n. 20, 77 S.Ct. at 1310 n. 20, 1 L.Ed.2d at 1508 n. 20, and *Spokane Arcades*. It then held:

> The instructions upheld in *Bartanen* repeatedly exclude normal, wholesome, healthy sexual desires from the scope of "prurient interest." The limiting construction absent in *J–R Distributors/Spokane Arcades* [i.e., the ALI definition] is clearly present here. Therefore, we reject the contention that the "prurient interest" definition in *Bartanen* is unconstitutionally overbroad.

*Polykoff*, 816 F.2d at 1336–37. For the same reasons given by the Ninth Circuit in *Polykoff*, we find defendants' argument here to be without merit.

## LICENSE FORFEITURE PROVISIONS

The last issue concerns the constitutionality of the license forfeiture provisions of A.R.S. § 13–603(G)[2] as applied in the context of the First Amendment. Specifically, defendants argue that special condition of probation 21, requiring them to surrender all permits and licenses, operates as an unconstitutional prior restraint in violation of their First Amendment rights.

At the mitigation/sentencing hearing, the trial court sentenced defendant Bauer to three years probation and jointly imposed upon both defendants a $27,400 fine. In addition, the court imposed special condition 21 which required defendants to surrender all "permits, licenses, grants, etc." which were issued in their names. The court specifically ordered the surrender of two City of Phoenix licenses for running a video center, a City of Phoenix privilege license, an Arizona Department of Revenue transaction privilege tax license, and defendants' proprietary or patent medicine license issued by the Arizona Board of Pharmacy.

Citing federal case authority, defendants argued to the trial court that such license forfeitures comprised an unconstitutional

**2.** At the time of trial the statute was § 13–603(F), but it has now been renumbered to § 13–603(G). A.R.S. § 13–603(G) (Supp.1987) provides:

> If a person or an enterprise is convicted of any felony, the court may, in addition to any other sentence authorized by law, order the forfeiture, suspension or revocation of any charter, license, permit or prior approval granted to such person or an enterprise by any department or agency of the state or of any political subdivision.

prior restraint on their freedom of expression under the First Amendment. The trial court stated that it was merely following the statutory sentencing provisions as required by law. However, recognizing First Amendment concerns, the trial court stayed the revocation of the licenses for 60 days in order for the defendants to seek a stay of that term of probation from this court. The parties then agreed to a stay of the surrender of the licenses pending appeal and we so ordered.

Defendants continue to characterize the license forfeitures as a prior restraint in violation of their First Amendment rights. They argue that the effect of the forfeitures is to restrain them from disseminating constitutionally protected material in the future based solely on the obscenity conviction. The state maintains that it cannot constitutionally enforce a statute *designed* to suppress protected speech absent compelling circumstances. However, the state argues that the license forfeiture provision is not designed to restrain speech, but is merely a statute of general applicability, designed to reach all offenders regardless of the underlying offense. Thus, the state contends that the defendants are simply being punished for violating the law and any restraint of speech is merely coincidental. We find the state's position unpersuasive.

The starting point for determining whether a statute acts as a prior restraint is *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). In that case, a Minnesota statute provided that publication, possession, or sale of either an "obscene" or a "malicious, scandalous and defamatory" periodical was a nuisance and could be judicially enjoined. *Id.* at 702, 51 S.Ct. at 626, 75 L.Ed. at 1360. Near published a newspaper which was found to be "malicious, scandalous and defamatory." After trial, a permanent injunction was issued enjoining him from conducting any further business under the name and title of the newspaper. The Supreme Court held that the injunction was unconstitutional.

The Court began by noting that the state has authority to enact laws which promote the health, safety, and general welfare of its people. However, this authority is not limitless. The limits of that power are to be "determined with appropriate regard to the particular subject of its exercise." *Id.* at 707, 51 S.Ct. at 628, 75 L.Ed. at 1363. For instance, the state's power is limited in the area of speech. In the context of prior restraint analysis "the court has regard to substance and not to mere matters of form," and "in accordance with familiar principles, the statute must be tested by its operation and effect." *Id.* at 708, 51 S.Ct. at 628, 75 L.Ed. at 1363–64. The Court concluded that the effect of the Minnesota nuisance abatement statute was prior restraint and held that such a restraint was contradictory to the freedoms protected by the First Amendment.

Although the Court in *Near* recognized that the prohibition against prior restraints is not absolute (exceptions include national security matters and obscenity), later Supreme Court decisions have strengthened First Amendment protections by holding that any system of prior restraint of expression comes to court with a heavy presumption of unconstitutionality. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963).

It is important to distinguish prior restraint from subsequent punishment. Subsequent punishment for violations of criminal obscenity laws does not prevent one from expressing oneself; it simply provides punishment for an expression which is harmful to the public welfare. This indeed "chills" free expression to some extent, but that is outweighed by the state's interest in the welfare of its citizens. On the other hand, a prior restraint stops one from speaking at all. This goes beyond "chilling"; it "freezes" speech.[3]

As we have already noted, obscenity is not protected by the First Amendment and may be criminally sanctioned. It may also be restrained prior to its dissemination, but only under certain

---

**3.** *See* A. Bickel, *The Morality of Consent* 61 (1975).

procedures adopted by the Supreme Court which are designed to mitigate any "chilling" effect. *See Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Even then, however, such procedures, usually nuisance abatement proceedings, are narrowly scrutinized. In *Vance v. Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), the defendant company challenged a Texas public nuisance abatement statute which allowed the trial court to enjoin the showing of a motion picture before a final adjudication of obscenity. In holding the statute unconstitutional the Court stated:

> Presumably, an exhibitor would be required to obey such an order [under the nuisance statute] pending review of its merits and would be subject to contempt proceedings even if the film is ultimately found to be nonobscene. *Such prior restraints would be more onerous and more objectionable than the threat of criminal sanctions after a film has been exhibited, since nonobscenity would be a defense to any criminal prosecution.*

*Id.* at 316, 100 S.Ct. at 1161–62, 63 L.Ed.2d at 421 (emphasis added) (footnote omitted). It is clear, then, that although prior restraints of obscenity are not unconstitutional *per se,* they are to be strictly viewed.

■ Several federal and state courts have addressed the First Amendment concerns presented by state laws and local ordinances which use a nuisance abatement power to control obscenity. Certain jurisdictions have attempted to abate nuisances by revoking the offenders' business licenses. *See Cornflower Entertainment, Inc. v. Salt Lake City Corp.,* 485 F.Supp. 777 (C.D.Utah 1980). Other jurisdictions utilize "padlock" laws which mandate a judicially-ordered injunction under which authorities close the place of business and bar its owners from operating in that location for the duration of the injunction. *See City of Paducah v. Investment Entertainment,* 791 F.2d 463 (6th Cir.), *cert. denied,* 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 290 (1986).

Whether dealing with "padlock" laws or with the question of using license forfeitures as a deterrent to obscenity, an overwhelming majority of courts have concluded that the involuntary closure of a motion picture theater or bookstore for obscenity violations is an unconstitutional prior restraint. *See, e.g., City of Paducah v. Investment Entertainment; Entertainment Concepts, Inc. III v. Maciejewski,* 631 F.2d 497 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981); *Spokane Arcades, Inc. v. Brockett,* 631 F.2d 135 (9th Cir.1980), *summarily aff'd,* 454 U.S. 1022, 102 S.Ct. 557, 70 L.Ed.2d 468 (1981); *Gayety Theatres, Inc. v. City of Miami,* 719 F.2d 1550 (11th Cir.1983) (per curiam); *Pollitt v. Connick,* 596 F.Supp. 261 (E.D.La.1984); *Cornflower Entertainment, Inc. v. Salt Lake City Corp.,* 485 F.Supp. 777 (C.D.Utah 1980); *Sanders v. State,* 231 Ga. 608, 203 S.E.2d 153 (1974); *State v. A Motion Picture Entitled "The Bet",* 219 Kan. 64, 547 P.2d 760 (1976). The court in *Pollitt v. Connick* summarized the cases as follows:

> These decisions establish that the first amendment permits injunctions against the future dissemination of *particular items* that have previously been judicially determined obscene, but it does *not* permit blanket injunctions against dissemination of materials not yet judicially determined obscene, regardless of the increased probability, due to the disseminator's prior track record, that the materials will actually be obscene.

596 F.Supp. at 271. A review of several of these decisions would be instructive.

In 1982, a Florida state court enjoined Gayety Theatres from showing a certain videotape which had been declared obscene. *Gayety,* 719 F.2d at 1550. Thereafter, the City of Miami revoked Gayety's business license for one year pursuant to the city code which allowed for revocation of licenses when the licensee had been permanently enjoined from disseminating material found to be obscene. The district court, in a memorandum opinion, found that the license revocation was an unconstitutional prior restraint. The Eleventh Circuit Court of Appeals, in a per curiam opinion, af-

firmed the district court's holding and adopted the memorandum opinion as its own.

In this case, there has been a judicial determination in state court that the plaintiff violated state law by exhibiting an obscene videotape. The City of Miami has constitutionally prevented further showing of that videotape. That it can surely do, but it cannot constitutionally pierce the First Amendment shield and bar, for one year, presumptively protected expression based only on prior unprotected conduct. The line between obscenity and protected expression is dim and uncertain. Under the law, the City can no more impose such a prior restraint on the plaintiff than could it by ordinance restrain a citizen from speaking in public for one year because the citizen once uttered an obscenity in a public place.

719 F.2d at 1552.

In *Cornflower Entertainment,* several of Cornflower's employees were convicted of distributing obscene materials in violation of state and local law. Under a Salt Lake City ordinance, businesses whose employees were convicted of those crimes could have their city operating licenses revoked by the Board of City Commissioners. As a result of the obscenity violations, the city revoked the company's licenses for one year.

The district court struck down the city ordinance as an impermissible prior restraint on the exhibitor's freedom of expression under the First Amendment. The court held that the city ordinance license revocation scheme resulted in the complete suppression of material for a period of one year, without regard to whether such material was constitutionally protected, based solely on a past obscenity conviction. 485 F.Supp. at 785. Finding no effort on the part of the city to provide safeguards to prevent legitimate expression from being restrained, the court held that the ordinance created an unconstitutional prior restraint containing none of the conditions necessary to pass constitutional muster.

Likewise, the Supreme Court of Georgia invalidated a statute which provided for the closing down of an entire bookstore on the basis of a finding that obscene material had been sold or shown on the premises. *Sanders v. State,* 203 S.E.2d at 154. The court found that although an adult bookstore is subject to reasonable regulation under the police power of the state like any other bookstore, the "overly broad" statute created an excessive "chilling effect" upon the exercise of free expression. *Id.* at 157. Furthermore, "[o]ne obscene book on the premises of a bookstore does not make an entire store obscene." *Id.* The closing of the store necessarily prohibited the sale of other material which may not have been obscene and was presumptively protected. Thus, the statute went too far.

In *City of Paducah v. Investment Entertainment,* the city enacted a public nuisance abatement ordinance which allowed the Board of Commissioners to rescind all licenses issued to a business which had distributed materials found to be obscene. Subsequently, police officers purchased various sexually explicit magazines and video tapes from certain businesses. Following notice to the management of these businesses, the city held public hearings, determined the purchased material to be obscene, and declared those businesses to be public nuisances. The city then sought abatement under the ordinance which contemplated the filing of a civil action to revoke the operating licenses of the businesses.

The issue presented to the court of appeals was whether Paducah could use license revocation as a tool to control obscenity. The Sixth Circuit found that the ordinance was unconstitutional since the license revocation procedure could have resulted in closing down an entire business, even though not all of the material was obscene. Therefore, the abatement procedure amounted to a prior restraint of protected speech as well as unprotected speech. The court stated:

> [T]he ... use of license revocation as a weapon against obscenity goes beyond merely deterring or punishing individuals who deal in obscene material. The ordi-

nance's purpose ... is to control future expression by businesses that have been subjected to the nuisance abatement procedure. The ordinance is a prior restraint of plaintiff's freedom of expression.

791 F.2d at 470. Thus, the license revocation procedure was unconstitutional.

Recently, in *State v. Feld*, 155 Ariz. 88, 745 P.2d 146 (App.1987), *cert. denied*, 485 U.S. ——, 108 S.Ct. 1270, 99 L.Ed.2d 482 (1988), we addressed the issue of closing or reorganizing businesses involved in trafficking in obscene items under the post-conviction civil remedies of Arizona's RICO statutes.[4] The *Feld* defendants were charged with conducting an illegal enterprise through racketeering which involved the exhibition of obscene films by various combinations of individuals and corporate defendants. They challenged the constitutionality of the RICO remedies as applied to criminal obscenity prosecutions. We found that the presence of free speech concerns mandated a careful construction of the statute.

> The state's remedies against obscenity under RICO are more limited than the state's remedies against other forms of racketeering activity. These limits are required by the federal and state constitutional rights regarding freedom of speech and press. The state can no more expect to reach protected interests by means of the RICO statutes than it could by means of moral nuisance or obscenity statutes.

155 Ariz. at 98, 745 P.2d at 156.

In assessing the constitutionality of our RICO remedies within a First Amendment context, we agreed with the reasoning of the Indiana Court of Appeals in *4447 Corp. v. Goldsmith*, 479 N.E.2d 578 (Ind.App. 1985), *vacated*, 504 N.E.2d 559 (Ind.1987), *cert. granted sub nom. Fort Wayne Books, Inc. v. Indiana*, 485 U.S. ——, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988).[5] In *4447 Corp.*, the defendants were charged under

Indiana RICO statutes with operating an illegal enterprise involving the dissemination of obscene materials. The Indiana statutes specifically provided for license forfeiture in addition to other civil remedies such as "padlocking" the establishment, revoking corporate charters, and forfeiting all proceeds from the distribution of the outlawed materials.

The Indiana Court of Appeals stated:

> Our foregoing analysis of the property seizure and forfeiture remedies under the prior restraint doctrine applies equally to other RICO/CRRA remedies. The state ... also seeks forfeiture of defendants' business licenses and revocation of their corporate charters. Because these licenses and charters are obviously prerequisites for the corporate defendants' continued operation, their denial or revocation works as effective a prior restraint as do the seizure and other forfeiture sanctions.

> Such denial or forfeiture of licenses and charters based upon the past behavior of a business in distributing obscenity has been roundly condemned as a prior restraint by other courts....

> These decisions are informed by the central teaching of *Near* that even the most flagrant abuses of the freedoms of speech and press do not justify the imposition of sanctions which prospectively curtail communicative activity. The corporate defendants' right to continue operation of these bookstores may not be abridged on the basis of past obscenity convictions, whether by padlock order, property forfeiture, or license revocation.

492 N.E.2d at 591-92 (citations omitted).

In *Feld*, we found that certain sections of Arizona's RICO statutes were unconstitutional. Specifically we held:

> [Subsections (D)(1), (2) and (3) of A.R. S. § 13-2314] act as a prior restraint upon the sale of privileged matter, and that the effect of the restraint is to close bookstores and theaters. The sanctions

---

**4.** A.R.S. § 13-2314 *et seq.* as adopted from the Racketeer Influenced and Corrupt Organizations Act. 18 U.S.C. §§ 1961-68 (1964).

**5.** We found the Indiana Court of Appeals opinion "more comprehensive and persuasive than the Indiana Supreme Court's reversal...." *Feld*, 155 Ariz. at 96, 745 P.2d at 152.

restrict future, presumptively protected speech, rather than punishing the distribution of unprotected speech in the past. 155 Ariz. at 97, 745 P.2d at 154–55. In the instant case, we fail to see how a sanction which effectively operates to permanently close a business is not an unconstitutional prior restraint merely because such a sanction falls under the sentencing provisions of A.R.S. § 13–603(G), rather than the RICO remedies of A.R.S. § 13–2314 et seq., or the Obscene Movie and Pictorial Publication Abatement Statutes under A.R.S. §§ 12–811 et seq., which we strictly construed in State v. Book–Cellar, 139 Ariz. 525, 679 P.2d 548 (App.1984). The license revocations here operate in the same manner as did the statutes in Feld and Book–Cellar. Namely, they foreclose the exercise of future, presumptively protected expression on the basis of a past obscenity violation. The First Amendment does not allow such an effect.

The state advances several arguments in support of license revocation as punishment for an obscenity conviction. First, it asserts, as it did in the trial court, that § 13–603(G) is not designed to suppress free expression and is therefore constitutional. It points out that the sentencing provisions of the statute are content-neutral and are designed to be applied to all offenders, regardless of the offense committed. Further, the state argues that the defendants are being punished for violating the law, and the fact that the penalty imposed affects free expression is merely an incidental result. Also, the state notes that other courts have upheld one-year closures of theaters based upon a past exhibition of obscene films. We find these arguments unpersuasive.

In support of its argument that the trial court, upon a finding of obscenity, may impose a closure or forfeiture to penalize past conduct involving the distribution of unprotected obscenity, the state cites: State ex rel. Kidwell v. U.S. Marketing, Inc., 102 Idaho 451, 631 P.2d 622 (1981), appeal dismissed, 455 U.S. 1009, 102 S.Ct. 1649, 71 L.Ed.2d 878 (1982); State ex rel. Ewing v. "Without a Stitch", 37 Ohio St. 2d 95, 307 N.E.2d 911 (1974), dismissed for

lack of a substantial federal question sub nom. Art Theater Guild, Inc. v. Ewing, 421 U.S. 923, 95 S.Ct. 1649, 44 L.Ed.2d 82 (1975); and State ex rel. Cahalan v. Diversified Theatrical Corp., 59 Mich.App. 223, 229 N.W.2d 389 (1975), rev'd on other grounds, 396 Mich. 244, 240 N.W.2d 460 (1976). We decline to follow these cases as they represent a minority view and are also distinguishable on their facts.

The trial court in Kidwell, upon finding that the defendant corporation had disseminated obscene material, imposed a one-year closure of the defendants' bookstores under Idaho's Moral Nuisance Abatement Act. Defendants challenged the closure order as an unconstitutional prior restraint. The Idaho Supreme Court found the abatement procedure to be constitutional. It ignored much of the caselaw precedent cited above, supra, p. 450, 768 P.2d p. 182, choosing to rely instead on the "Without A Stitch" and Diversified decisions. See Kidwell, 631 P.2d at 629 n. 10.

The Idaho court based its holding on the fact that the closure was temporary. Furthermore, the court noted that the defendant was not barred from conducting business, because the closure was only a forfeiture of a specific piece of property and the defendant was free to do business elsewhere. We find that the presence of those factors in Kidwell distinguishes that case from the one at hand.

The Kidwell court relied, in part, on the Diversified decision, which the state also relies upon here. In Diversified the defendant corporation was found to have violated the Michigan Public Nuisance Act by exhibiting obscene motion pictures. Pursuant to the Act, the trial court ordered a one-year closure of the theater. The Michigan Court of Appeals upheld the closure because the defendant was enjoined only from showing films in the particular building. Thus, the defendant could show films at some other location. Furthermore, the Act made provision for a "release" from the closure. Neither of those two factors is present in our case. The license revocation here is permanent and bars the defend-

ants from disseminating *any* material. Thus, *Diversified* is also inapplicable.[6]

Finally, both *Kidwell* and the state in the instant case rely upon *State ex rel. Ewing v. "Without a Stitch".* In that case, the Ohio Supreme Court ruled that closure provisions of its nuisance abatement statutes (which were similar to those in Idaho), comprised a constitutionally permissible method of controlling obscenity. Although the United States Supreme Court has yet to rule on these types of "padlock" laws, the *Kidwell* court reasoned, as does the state here, that the Supreme Court's dismissal of *"Without a Stitch"* for lack of a substantial federal question constituted a ruling on the merits which implicitly approved of nuisance closure provisions. *Kidwell,* 631 P.2d at 628. However, *"Without a Stitch,"* whether or not implicitly approved by the Supreme Court, provides little aid to the state.

The Ohio court in *"Without a Stitch"* narrowly construed the closure provision. It noted that a release was available and that the nuisance was only the showing of the particular movie which had been declared obscene. Thus, under the court's decision, the effect of the closure was not great since the theater could show other films not determined to be obscene. *"Without a Stitch"*, 307 N.E.2d at 917–18; *see also Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (noting that the Ohio court in *"Without a Stitch"* narrowly construed the Ohio statute to avoid prior restraint problems). Again, this case is not helpful to the state. No such construction of § 13–603(G) is possible. It operates to bar the defendants from *all* future dissemination by revoking their licenses to do business.

We find *Kidwell, Diversified* and *"Without a Stitch"* contrary to both the Arizona and majority view and clearly distinguishable from the *license* forfeiture cases. In "padlock" or *property* forfeiture cases, the opportunity remains for an exhibitor or bookstore owner to reopen at another location if that person so chooses. However, if a purveyor of sexually explicit materials must forfeit business operating licenses as part of the penalty, such a revocation operates to preclude that person from selling or exhibiting protected, non-obscene material in the future. Unlike the "padlock" cases, he could not simply move next door and reopen for business.

The state's argument that § 13–603(G) is merely a statute of general applicability and therefore any effect upon defendant's First Amendment rights is incidental is equally unpersuasive. The state argues that attorneys, doctors, realtors and others could have their licenses or permits revoked as a result of a felony conviction. This misses the point. There is an extra dimension to the case before us. The presence of First Amendment concerns requires that we carefully consider the effect of the statute as it has been applied. *Near,* 283 U.S. at 708, 51 S.Ct. at 628, 75 L.Ed. at 1363–64 (statute must be tested by operation and effect). That effect is to bar the defendant from any future business of selling protected materials because of one obscenity conviction.

In support of its argument that statutes of general applicability apply regardless of First Amendment implications, the state cites: *United States v. Pryba,* 674 F.Supp. 1504 (E.D.Va.1987); *Polykoff v. Collins,* 816 F.2d 1326 (9th Cir.1987); and *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). Again, we find these cases inapplicable.

The decision rendered by the Ninth Circuit in *Polykoff v. Collins* is inapposite to the state's position. As we have noted, *Polykoff* upheld our supreme court's interpretation of "prurient interest" and the constitutionality of the Arizona obscenity statutes following a challenge based upon vagueness and overbreadth. In addition, the Ninth Circuit upheld Arizona's felony

---

**6.** We note that the Michigan Supreme Court reversed the Court of Appeals' opinion without reaching the First Amendment issues. 240 N.W.2d at 463. "We ... read [*Diversified* ] as standing solely for the proposition that motion picture theatres may not be enjoined from showing obscene films under the abatement act." *State ex rel. Wayne County Prosecuting Attorney v. Levenburg,* 406 Mich. 455, 280 N.W.2d 810, 811 (1979).

fine provisions, holding that Arizona sentencing guidelines "insure that the fines will be used for deterrent purposes and not for suppressive purposes." *Polykoff,* 816 F.2d at 1338.

Presumably, the state's argument is that the license revocations, like felony fines, are a deterrent and therefore only incidentally suppressive. Yet, the license revocations are more than a deterrent, they are a prior restraint upon the sale of privileged material. It is true, and the *Polykoff* court found, that fines have some chilling effect. However, this effect is permissible since it is a subsequent punishment and not a prior restraint. Further, the fines do not bar defendants from operating their business and are not overly broad, but narrowly support the state's legitimate deterrent goal. The license revocations at issue are not analogous to a fine.

Furthermore, we find that *United States v. Pryba* supports both our decision in *State v. Feld* and the Ninth Circuit's reasoning in *Polykoff.* In *Pryba,* owners and operators of video stores were criminally indicted for disseminating obscene materials with accompanying criminal forfeiture provisions under the federal RICO statutes. Unlike the prosecution in *Feld,* however, the prosecutors in *Pryba* did not seek to reorganize or dissolve the existing businesses; rather, they sought to enforce the statutory provisions allowing the forfeiture of property and proceeds directly linked to the commission of the crime. Thus, the *Pryba* court, noting that RICO provisions like those struck down in *Feld* (post-conviction civil remedies) were not at issue, found a nexus between the violation of the federal obscenity laws and the forfeiture of the interest or proceeds used in the commission of that crime. Mindful of potential First Amendment ramifications, the *Pryba* court stated:

> The forfeiture remedy, *properly construed* and *applied* does not impermissibly restrain further dissemination of speech, but rather simply requires those engaged in racketeering to disgorge their ill-gotten gains.

674 F.Supp. at 1516 (emphasis added). Based upon that principle, the court found that the criminal forfeiture provisions were analogous to fines and were subsequent punishments which have been consistently upheld. This holding has no application to our case.

Finally, the state relies on *Arcara v. Cloud Books, Inc.* to support the license revocation order. The issue in *Arcara* was whether the First Amendment precluded New York State from closing an adult bookstore found to be a place of prostitution. The Supreme Court held that no First Amendment rights were implicated by enforcement of a public health regulation of general application against premises upon which books happen to be sold. 478 U.S. at 707, 106 S.Ct. at 3178, 92 L.Ed.2d at 578. In reaching that conclusion, the court noted:

> The closure order sought in this case differs from a prior restraint in two significant respects. First, the order would impose no restraint at all on the dissemination of particular materials since respondent is free to carry on his bookselling business at another location, even if such locations are difficult to find. Second, the closure order sought would not be imposed on the basis of an advance determination that the distribution of particular materials is prohibited—indeed, the imposition of the closure order has nothing to do with any expressive conduct at all.

478 U.S. at 705–06 n. 2, 106 S.Ct. at 3177 n. 2, 92 L.Ed.2d at 577 n. 2. Clearly, *Arcara* has no application to the case before us.

### CONCLUSION

We hold that the revocation of defendants' essential operating permits and license to disseminate materials which fall within the ambit of the First Amendment acts as an unlawful prior restraint.

██ However, we note that under special condition of probation 21, in addition to the other transaction privilege licenses, the trial court also revoked defendants' "proprietary or patent medicine license permit" issued by the Board of Pharmacy. The

**456**

revocation of this patent medicine license creates no prior restraint on the defendants' ability to continue to disseminate material which is protected under the First Amendment. Rather, such a revocation comprises a permissible penalty constitutionally imposed upon the defendants as punishment for their illegal conduct. Whatever chilling effect such a revocation may have is legitimate, intended, and immune from attack on the grounds that it is a prior restraint.

We affirm the convictions but vacate the terms of probation and remand this matter to the trial court with directions that the court impose conditions of probation in a manner consistent with this opinion.

SHELLEY, P.J., and GRANT, V.C.J., concur.